**Affirmed and Opinion filed November 21, 2013.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-12-01155-CV

---

## LASIK*PLUS* OF TEXAS, P.C AND LCA-VISION, INC., Appellants

## V.

## FEDERICO MATTIOLI, M.D., Appellee

---

**On Appeal from the 80th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2012-68429**

---

## O P I N I O N

Appellants Lasik*Plus* of Texas, P.C. and LCA-Vision, Inc. bring this interlocutory appeal from the trial court's denial of their application for a temporary injunction against Federico Mattioli, M.D., whom appellants allege violated a covenant not to compete and a notice of termination provision in an employment contract. In two issues and numerous sub-issues, appellants contend that the trial court erred in denying the temporary injunction. We affirm.

# I. Background

On November 13, 2003, Mattioli, an ophthalmologist, entered into an Employment Agreement with Lasik*Plus* to provide laser eye surgery and related services at the Lasik*Plus* clinic in Houston, Texas. Lasik*Plus* is a professional association originally formed by Mattioli. LCA-Vision is expressly referenced in the Employment Agreement as the manager of the Lasik*Plus* clinics, and appellants maintain that LCA-Vision is a third-party beneficiary of the agreement.[1] Among other provisions, the agreement contains both a covenant not to compete and a notice of termination clause.

On October 16, 2012, Mattioli notified Lasik*Plus* that his last day of employment would be November 16, 2012, although he later revised this to be November 17. As that date drew near, Mattioli revealed that he would be opening a new clinic, featuring laser surgical procedures, less than two miles from the Lasik*Plus* clinic. Appellants (Lasik*Plus* and LCA-Vision) thereafter filed the present lawsuit, alleging, among other things, that Mattioli had breached the covenant not to compete and the notice provision contained in the Employment Agreement.[2] Appellants sought damages for the alleged breaches and sought to enjoin Mattioli from operating his clinic within the area and for the time-period prohibited by the covenant not to compete. More specifically, appellants requested an immediate temporary restraining order (TRO) as well as temporary and

---

[1] According to an affidavit by Mattioli contained in the record, Lasik*Plus* began its first clinic in Houston but grew to have clinics in Dallas, San Antonio, and Austin, and LCA-Vision is a publicly-traded corporation with dozens of laser vision correction centers across numerous states. The record further includes a Management Agreement between Lasik*Plus* and LCA-Vision demonstrating considerable interconnectedness between the entities in running the Houston clinic.

[2] In their pleadings, appellants also alleged tortious interference with business relations against Mattioli and sought a declaratory judgment, essentially that Mattioli had breached the agreement.

permanent injunctions relating to the covenant not to compete. The covenant reads in pertinent part as follows[3]:

> 8.1. <u>Covenant Not to Compete</u>. Physician [Mattioli] agrees during the Term of this Agreement and for eighteen (18) months after termination of Physician's employment with LPT [Lasik*Plus*] to not:
>
> > 8.1.1. engage in any manner in the delivery of laser vision correction services (other than as an employee of LPT) in the Restricted Area including, but not limited to, directly or indirectly, owning, managing, joining, operating, controlling, contracting with, being employed by, acting in the capacity as officer, director, trustee, shareholder, member, or partner or consultant or participating in or being connected in any manner with the ownership, management, operation, or control of any person, firm, or corporation providing laser vision correction services or facilities. For purposes herein, the Restricted Area is defined as: A radius of twenty (20) miles from, or in any county contiguous to the county in which, any laser vision facility owned, operated or managed by LPT or LCA-Vision Inc., or any subsidiary or affiliate thereof in the State of Texas as of the Effective Date of this Agreement or as of the date of termination of Physician's employment with LPT. . . , or
> >
> > 8.1.3. directly or indirectly, induce or solicit any of LPT's patients, regardless of their location, to obtain professional medical, services from any business, corporation, partnership or entity other than LPT's or from any person who is not an employee or affiliate of LPT; provided, however, that the foregoing shall not prohibit a bona fide referral of a patient to another provider of professional medical services if such is medically indicated and necessary for such patient.

---

[3] Section 8 of the agreement is entitled "Restrictive Covenant." In addition to the covenant not to compete, the agreement also contains a clause prohibiting Mattioli from soliciting other employees to terminate their employment with Lasik*Plus* or LCA-Vision. As will be shown below, section 8 further includes provisions regarding remedies and enforcement.

The Employment Agreement also includes a "Remedies" clause pertaining to the covenant not to compete. It provides:

> 8.3. <u>Remedies</u>. Physician agrees that LPT would suffer immediate and irreparable harm by a breach of Section 8.1 or Section 8.2. In the event of Physician's actual or threatened breach of the provisions of Section[] 8.1 . . . , LPT shall be entitled to an injunction against said breach by Physician, and Physician hereby consents to such injunction by a court in accordance with the laws of the State of Texas and upon notice to Physician, and an opportunity to be heard; provided, however, that LPT shall not be prohibited from pursuing any other remedies for such breach or threatened breach, including, without limitation, recovery of damages from Physician. . . .

Additionally, the agreement contains an "Enforcement" provision that also applied to the covenant not to compete. It reads as follows:

> 8.4. <u>Enforcement</u>. It is further agreed that if a court determines the aforesaid covenant[] not to compete . . . to be unreasonable as to time or area or otherwise, the parties consent to the reformation of the covenants by such court, and LPT or [LCA-Vision], as the case may be, shall be entitled to enforce the covenants for such period of time and within such area and otherwise as may be determined to be reasonable by such court.

In addition to the covenant not to compete, the other provision in the Employment Agreement that appellants contend Mattioli breached, as relevant to this opinion, is the termination notice provision. That section states in relevant part:

> 4.3. Physician may terminate this Agreement (a) with 120 days advance written notice to LPT or (b) immediately if LPT is in material breach of this Agreement and such default continues for a period of thirty (30) days after Physician gives written notice thereof to LPT. . . .

The trial court granted appellants an ex parte TRO at the time their Original

4

Petition was filed. After Mattioli answered in the lawsuit, the court held a hearing on appellants' request for a temporary injunction. At the hearing, Mattioli's attorney stipulated that Mattioli signed the Employment Agreement, did not provide the requisite notice of employment termination, and was opening an ophthalmology clinic within two miles of appellants' clinic. Appellants then presented live testimony from Dave Thomas, the CFO and co-CEO of LCA-Vision. Thomas emphasized the money appellants spent in marketing Lasik*Plus* and Mattioli together, and he opined that after termination of his employment, Mattioli would continue to reap the benefit of that advertising whereas appellants' goodwill would be adversely affected if Mattioli was allowed to independently perform laser surgeries in the area. Thomas further discussed and appellants introduced documentary evidence revealing that internet searches for Mattioli and Lasik*Plus* still showed a connection between the two even after termination of the relationship.

Mattioli primarily argued at the hearing that the covenant contained in the Employment Agreement violated the Texas Covenants Not to Compete Act and, thus, was unenforceable and not a proper basis for ordering injunctive relief. *See* Tex. Bus. & Com. Code §§15.50-.52. As will be discussed in more detail below, the Act requires such covenants involving physicians to include buy-out provisions, which this covenant does not. *Id*. § 15.50(b)(2). Following the hearing, the trial court requested briefing concerning its authority to reform the covenant. Also after the hearing, Mattioli filed two affidavits in which he averred that appellants' advertising expenditures were not physician-specific but were for the clinic as a whole, imposition of the TRO had caused him substantial financial losses as a very large percentage of his revenues were derived from laser correction surgeries, and at the time the Employment Agreement was being drafted, he

5

proposed the addition of a buy-out provision related to the covenant not to compete, but his suggestion was rejected. The trial court subsequently denied the temporary injunction and dissolved the TRO without stating the grounds therefor. Appellants then filed this interlocutory appeal.[4]

## II. Standard of Review

The purpose of a temporary injunction is to preserve the status quo of the subject matter of the litigation pending a trial on the merits. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002).[5] A temporary injunction is an extraordinary remedy and does not issue as a matter of right. *Id*. To obtain a temporary injunction, the applicant must plead and prove (1) a cause of action against the defendant, (2) a probable right to the relief sought, and (3) a probable, imminent, and irreparable injury in the interim. *Id*. An injury is irreparable if the injured party cannot be compensated adequately in damages or if the damages cannot be measured by any certain pecuniary standard. *Id*. At a temporary injunction hearing, the trial court considers whether the applicant has shown a probability of success and irreparable injury; the parties do not present the underlying merits of the controversy. *EMS USA, Inc. v. Shary*, 309 S.W.3d 653, 657 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

Whether to grant or deny a request for a temporary injunction is within the trial court's discretion, and we will not reverse its decision absent a clear abuse of discretion. *Butnaru*, 84 S.W.3d at 204; *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993). An abuse of discretion does not occur when the trial court bases its

---

[4] This is an accelerated interlocutory appeal pursuant to Texas Civil Practice and Remedies Code section 51.014(a)(4).

[5] Appellants assert that the status quo in need of injunctive protection in the present case is their market share and the value of their goodwill, which they claim will be harmed by Mattioli's performance of laser eye surgeries in violation of the noncompete covenant.

decision on conflicting evidence. *Correa v. Houston Surgical Assistant Servs., Inc.*, No. 14-12-01050-CV, 2013 WL 3958499, at *4 (Tex. App.—Houston [14th Dist.] July 30, 2013, no pet.) (mem. op.). When, as here, no findings of fact or conclusions of law are filed[6], the trial court's determination of whether to grant or deny a temporary injunction must be upheld on any legal theory supported by the record. *EMS USA*, 309 S.W.3d at 657. When consideration of evidence is required, we view it in the light most favorable to the trial court's order, indulging every reasonable inference in favor of the trial court's determination. *EMSL Analytical, Inc. v. Younker*, 154 S.W.3d 693, 696 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

An appeal of an order granting or denying a temporary injunction based on a noncompete covenant does not present for appellate review the ultimate question of whether the covenant is enforceable under the Act. *Id*. In reviewing a trial court's granting or denying of an application for a temporary injunction, we review only the trial court's exercise of discretion in determining that a plaintiff did not show (1) likelihood of success on the merits at trial, or (2) irreparable injury. *Id*.

### III. Analysis

As stated, appellants make several arguments supporting their request for a temporary injunction spread over two issues.[7] Although appellants offer some discussion related to the probable irreparable harm requirement for a temporary

---

[6] On February 27, 2013, Lasik*Plus* filed a letter with this court stating that the trial court had signed findings of fact and conclusions of law and that Lasik*Plus* was attempting to obtain a supplemental clerk's record containing the findings and conclusions. No supplemental record has been filed. The record before us does not contain any findings or conclusions or any indication that they were entered by the trial court.

[7] Some of appellants' arguments are raised to some degree under both of their broadly defined issues; we will therefore organize this opinion based on the distinct arguments and not based on the two issues. The disposition of the case is in no way affected by this organization.

injunction, their main focus, as was that of the trial court, is on the probable right to recovery.  In this opinion, we will likewise focus on appellant's likelihood of success on the merits as that issue was presented to the trial court.  Appellants primarily argue that the trial court erred in (1) applying section 15.50 of the Business and Commerce Code in the temporary injunction context, (2) refusing to consider reformation of the contract to comply with section 15.50, and (3) ignoring Mattioli's breach of the notice provision as an alternative basis for the temporary injunction.  We will discuss each in turn.

## A.  Consideration of § 15.50

We begin with appellants' contention that the trial court erred in considering the effects of Business and Commerce Code section 15.50 in denying the temporary injunction.  While we agree with appellants that the section does not *govern* the temporary injunction analysis, caselaw clearly supports the position that the dictates of section 15.50 can be considered when assessing the likelihood of success on the merits, an integral part of the determination of whether a temporary injunction should be granted.  *See Butnaru*, 84 S.W.3d at 204.

The relevant portions of section 15.50 read as follows:

### § 15.50. Criteria for Enforceability of Covenants Not to Compete

(a)  Notwithstanding Section 15.05 of this code,[8] and subject to any applicable provision of Subsection (b), a covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

_____

[8] Among other applications, section 15.05 generally makes contracts in restraint of trade unlawful.  Tex. Bus. & Com. Code § 15.05.

8

(b)   A covenant not to compete relating to the practice of medicine is enforceable against a person licensed as a physician by the Texas Medical Board if such covenant complies with the following requirements:

. . . .

(2)   the covenant must provide for a buy out of the covenant by the physician at a reasonable price or, at the option of either party, as determined by a mutually agreed upon arbitrator or, in the case of an inability to agree, an arbitrator of the court whose decision shall be binding on the parties . . . .

Tex. Bus. & Com. Code §15.50.

It is undisputed that Mattioli is a physician licensed by the State of Texas, so the Employment Agreement and attendant covenant are within the class of agreements covered by section 15.50(b).  Appellants also expressly concede that the Employment Agreement does not fulfill the requirements of section 15.50(b) because the agreement does not provide for a buy-out of the covenant not to compete as required by subsection (b)(2).

In support of their contention that section 15.50 has no application in temporary injunction proceedings, appellants cite cases wherein courts, including this one, have concluded that the section does not preempt the statutory and common law principles that already govern such proceedings.  *See, e.g., EMSL Analytical*, 154 S.W.3d at 695 (explaining that the Act governs only final remedies and looking to common law principles in determining whether the trial court properly denied the application for temporary injunctive relief); *Cardinal Health Staffing Network, Inc. v. Bowen*, 106 S.W.3d 230, 236–240 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (en banc) (conducting a comprehensive analysis of the Act and concluding that it was intended to govern only final remedies).

However, just because section 15.50 does not control the analysis in

9

interlocutory orders does not mean it plays no role in that analysis. As set forth above, to be entitled to a temporary injunction, an applicant must establish, among other things, a probability of ultimate success on the merits. *See*, *e.g.*, *Butnaru*, 84 S.W.3d at 204; *EMS USA*, 309 S.W.3d at 657. This requirement protects opposing parties from the inherent interference of temporary injunctions when it appears unlikely that the applicant ultimately will prevail in the lawsuit. As appellants recognize, section 15.50(b) will play a pivotal and possibly dispositional role in the final outcome of appellants' cause of action for breach of the noncompete covenant. Accordingly, in order to properly assess appellants' likelihood of success on the merits, the trial court was required to consider the potential application of section 15.50(b) under the circumstances presented. *See EMS USA*, 309 S.W.3d at 657-60 (reviewing trial court's denial of application under common law principles and declining to address ultimate issue of noncompete covenant's enforceability but reversing and remanding because trial court failed to consider evidence relevant to enforceability analysis under section 15.50); *Tom James of Dallas, Inc. v. Cobb*, 109 S.W.3d 877, 885-89 (Tex. App.—Dallas 2003, no pet.) (refusing to reach ultimate issue of covenant's enforceability on appeal from denial of temporary injunction application but considering requirements for enforceability under section 15.50 in determining whether applicant established "a probability of success on the enforceability of the covenants"); *see also Shoreline Gas, Inc. v. McGaughey*, No. 13-07-364-CV, 2008 WL 1747624, at *12 n.9 (Tex. App.—Corpus Christi April 17, 2008, no pet.) (mem. op.) ("[W]e review the trial court's statement that the provisions at issue are unenforceable only insofar as it affects one or more of the elements required for a temporary injunction[:] a cause of action, a probable right to relief, [and] probable imminent and irreparable injury.").

10

Appellants argue at length that the trial court—in considering the possible application of section 15.50 at this preliminary stage—prematurely ruled on the ultimate merits of the case and deprived the jury of their role in determining the outcome. The court has done nothing of the sort. The case continues unabated toward final resolution, whether through trial by jury, trial to the court, summary judgment, or some other process. The court here merely made an assessment of the probable outcome based on the evidence and argument presented. The court committed no error in doing so.

## B. Reformation

Next, appellants contend the trial court erred in failing to consider the possibility that the contract could be reformed to include a buy-out provision in order to comply with section 15.50(b)(2). In their live pleading, appellants have requested such reformation in the event the noncompete covenant is found to be unenforceable. Appellants do not contend that the trial court should have reformed the agreement at this preliminary stage but maintain the court should have considered the possibility of reformation in assessing appellants' likelihood of success on the merits.[9] Appellants advance three possible bases for reformation: (1) language in the Employment Agreement itself regarding reformation, (2) the legislative history of section 15.50 allegedly suggesting reformation could be undertaken in these circumstances, and (3) mutual mistake. We discuss each in turn.[10]

---

[9] This argument is, of course, stated as an alternative to appellants' argument discussed above that the trial court should not have considered the possible application of section 15.50 in the temporary injunction context.

[10] Appellants' reformation arguments are interwoven to some degree, and it is, therefore, somewhat unclear whether they intended to make three separate arguments or one unified argument. We address each of the three arguments we can discern and find them to be without merit either as separate arguments or as component parts of a unified whole. As we have said

11

## 1. Contract Language

The specific contract language appellants claim authorizes reformation appears in section 8.4 of the agreement, entitled "Enforcement." It provides:

> [I]f a court determines the . . . covenant[] not to compete . . . to be *unreasonable as to time or area or otherwise*, the parties consent to the reformation of the covenants by such court, and [appellants] shall be entitled to enforce the covenants for such period of time and within such area and otherwise as may be determined to be reasonable by such court.

(Emphasis added).

Appellants focus on the use of the word "otherwise" in section 8.4, suggesting that the lack of a buy-out clause in the contract falls within the term's ambit. However, the language of 8.4 is clear that it applies only when a court determines the covenant not to compete to be unreasonable. Here, the trial court's implied finding is that the noncompete covenant is not likely to be determined enforceable due to its failure to comply with section 15.50(b)(2). There is no indication the trial court made or was asked to make even a preliminary assessment regarding the covenant's reasonableness as to time, area, or otherwise. Section 8.4 of the agreement therefore does not apply under these circumstances, and appellants have not established a probable right to recovery on this basis. *See, e.g., City of San Antonio v. Headwaters Coalition, Inc.*, 381 S.W.3d 543, 545-46, 554 (Tex. App.—San Antonio 2012, pet. denied) (reversing grant of temporary

---

before, the underlying objective of reformation is to correct a mutual mistake made in preparing a written instrument, so that the instrument truly reflects the original agreement of the parties. *See Comiskey v. FH Partners, LLC*, 373 S.W.3d 620, 633 (Tex. App.—Houston [14th Dist.] 2012, pet. denied). As will be seen, some of appellants' arguments stretch the bounds of this general principle. We take no position regarding whether appellants' approaches to reformation could succeed under different circumstances.

12

injunction where applicant failed to demonstrate a probable right to recovery).[11]

## 2. Reformation under Section 15.50

Although acknowledging that the noncompete covenant as written does not meet the requirements of section 15.50 due to the absence of a buy-out provision, appellants suggest that the legislative history of the section authorizes reformation to add such a provision. As discussed above, under section 15.50, a noncompete covenant relating to the practice of medicine is enforceable if, among other requirements, it provides

> for a buy out of the covenant by the physician at a reasonable price or, at the option of either party, as determined by a mutually agreed upon arbitrator or, in the case of an inability to agree, an arbitrator of the court whose decision shall be binding on the parties.

Tex. Bus. & Com. Code §15.50(b)(2). Appellants maintain that this subsection is ambiguous regarding the authority of an arbitrator to reform the agreement and that the legislative history of the section demonstrates that broad reformation powers were contemplated to ensure that covered noncompete covenants meet the requirements of the section. Mattioli disagrees and asserts the section is not ambiguous, and, even if it were, legislative history reveals no intent to imbue arbitrators with broad reformation powers.

In construing statutory language, our primary objective is to ascertain and give effect to the legislature's intent. *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011). "Enforcing the law as written is a court's safest refuge in matters of statutory construction, and we should always refrain from rewriting text that

---

[11] Appellants also argue that the trial court had a duty to harmonize the provisions of the contract in order to give effect to the parties' intent to be bound by the covenant not to compete. However, we cannot rewrite a contract or add to its language under the guise of interpretation. *Frontier Logistics, L.P. v. Nat'l Prop. Holdings*, No. 14-11-00357-CV, 2013 WL 5738198, at *3 (Tex. App.—Houston [14th Dist.] Oct. 17, 2013, no pet. h.).

lawmakers chose . . . ." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 443 (Tex. 2009). We consider issues of statutory construction de novo. *Molinet*, 356 S.W.3d at 411. We may consider legislative history in construing a statute. Tex. Gov't Code § 311.023(3). However, the plain meaning of the text, given the context of the statute as a whole, provides the best expression of legislative intent. *Molinet*, 356 S.W.3d at 411.

Here, there is no indication in section 15.50 that the legislature intended to invest courts or arbitrators with the authority to reform noncompete covenants to create buy-out provisions. To the contrary, the section as a whole provides that if a noncompete covenant involving a physician does not have a buy-out clause, it is not enforceable. Tex. Bus. & Com. Code § 15.50(b). The language in subsection 15.50(b)(2) concerning arbitration clearly contemplates only the issue of a reasonable price for a buy-out; it does not suggest a court or arbitrator could add a buy-out clause to a covenant that does not contain one. Because the statutory language clearly supports the opposite of appellants' assertions, we need not delve into the parties' disagreements regarding legislative history. *See generally Molinet*, 356 S.W.3d at 411.

### 3. Mutual Mistake

Lastly, appellants suggest that there was a mutual mistake between the parties to the Employment Agreement, Lasik*Plus* and Mattioli, which led to the omission of a buy-out clause when the parties intended to include one. In support, they point out that the parties expressed the intent to be bound to the noncompete covenant.[12] Appellants do not cite to any evidence or make any other arguments

---

[12] In this regard, appellants specifically cite the language in section 8.3 which reads in part:

> 8.3. <u>Remedies</u>. . . . In the event of Physician's actual or threatened breach of the provisions of Section[] 8.1 . . . , [Lasik*Plus*] shall be entitled to an injunction

14

supporting a mutual mistake finding.

A party seeking reformation of a contract based on mutual mistake must prove: (1) an original agreement and (2) a mutual mistake, made by both parties and occurring after the original agreement, in reducing the original agreement to writing. *Comiskey v. FH Partners, LLC*, 373 S.W.3d 620, 633 (Tex. App.— Houston [14th Dist.] 2012, pet. denied). "The doctrine of mutual mistake must not routinely be available to avoid the result of an unhappy bargain." *Williams v. Glash*, 789 S.W.2d 261, 265 (Tex. 1990).

Mattioli offered his own affidavit, stating that at the time the Employment Agreement was being drafted, he proposed inclusion of a buy-out provision but appellants' representative rejected the proposal. He further stated that "[t]here was no mistake as to whether to include a buyout provision."[13] Given the fact Mattioli provided the court with evidence contrary to the existence of a mutual mistake and appellants offered no evidence on the issue, the trial court did not abuse its

against said breach by [Mattioli], and [Mattioli] hereby consents to such injunction by a court in accordance with the laws of the State of Texas and upon notice to Physician, and an opportunity to be heard . . . .

Appellants suggest only that this clause evidences an intent to be bound by the noncompete covenant.

[13] Both parties cite Mattioli's affidavit as support for their positions, but contrary to appellants' assertion, nothing in the affidavit suggests that there was merely "a disagreement as to the amount of a buyout price at the time the contract was signed." *See generally Millwrights Local Union No. 2484 v. Rust Eng'g Co.*, 433 S.W.2d 683, 686 (Tex. 1968) (providing parties may agree to use of affidavits as evidence in temporary injunction proceedings). The affidavit clearly indicates that appellants' representative did not want such a clause as Mattioli proposed. Both parties agree that the trial court sought further briefing on the issue of reformation, and both sides submitted post-hearing briefing and exhibits in response to that request. Mattioli's affidavit was attached as an exhibit to his supplemental briefing. Appellants did not object to consideration of Mattioli's affidavit in the trial court and do not object on appeal. *See generally Ahmed v. Shimi Ventures, L.P.*, 99 S.W.3d 682, 684 n.2 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (considering affidavits in reviewing temporary injunction order where opposing party did not object). The trial court denied the application for a temporary injunction on the same day that Mattioli's trial brief and affidavit were filed.

discretion in refusing to hold that appellants demonstrated a likelihood of success based on the possibility the agreement could be reformed. *See generally Correa*, 2013 WL 3958499, at *4 (explaining that an abuse of discretion does not occur when the trial court's decision is supported by evidence).[14] Moreover, based on the foregoing reasoning, the court did not abuse its discretion to the extent it determined appellants failed to demonstrate a likelihood of success on the merits based on their reformation arguments.

### C. Notice as Alternate Basis for Injunction

Appellants additionally contend that the trial court erred in ignoring Mattioli's alleged breach of the Employment Agreement's notice provision as an alternative basis for the temporary injunction. As appellants point out, Mattioli's attorney stipulated at the temporary injunction hearing that Mattioli gave only 30-days' written notice before opening his new clinic and not the 120-days' notice required under section 4.3 of the Employment Agreement.[15]

Appellants, however, neither cite to a request in the trial court for an injunction based on the failure to provide proper notice nor explain how Mattioli's failure to give 120-days' notice could support issuance of the temporary injunction they sought. Appellants' request, which was incorporated in their live pleading, sought a temporary injunction based only on alleged violations of section 8 of the

---

[14] Appellants again suggest that the trial court prematurely ruled on the ultimate merits and deprived them of their right to a final trial on the issue of the parties' intent. The trial court simply denied appellants' application for a temporary injunction because the court determined that they did not meet their burden for interlocutory injunctive relief. *See Loye v. Travelhost, Inc.*, 156 S.W.3d 615, 620 (Tex. App.—Dallas 2004, no pet.) ("The trial judge's decision to grant a temporary injunction was based on the evidence presented at the temporary injunction hearing. We cannot assume this evidence will be the same as the evidence developed at a full trial on the merits.").

[15] Mattioli's counsel did not concede that Mattioli breached the agreement; he only conceded that Mattioli did not give 120 days' notice.

Employment Agreement, containing the noncompete covenant and a prohibition on soliciting fellow employees. The request does not mention section 4.3, which contains the notice requirement.[16]

Moreover, an alleged breach of an agreement does not automatically entitle the plaintiff to a temporary injunction pending trial; as discussed in detail above, temporary injunctions require specific matters be demonstrated by the applicant, including a probable right to the relief sought and probable, imminent, and irreparable injury in the interim. *See Butnaru*, 84 S.W.3d at 204. Appellants insist that Mattioli's attorney's stipulation on notice entitles them to a temporary injunction, but they offer no reasoning as to why a failure to give proper notice entitles them to restrict the professional services Mattioli could offer to his clients within a geographical area and until trial. Whatever damages appellants claim resulted from Mattioli's 30-day notice were sustained long ago. Although we construe briefs liberally, *see* Texas Rule of Appellate Procedure 38.9, we will not make appellants' arguments for them. *E.g., Tello v. Bank One, N.A.*, 218 S.W.3d 109, 116 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Accordingly, we reject appellants' arguments based on the notice requirement of section 4.3.

## IV. Conclusion

Having held that each of appellants' distinct arguments is without merit and the trial court did not abuse its discretion in denying their request for a temporary injunction, we overrule appellants' two issues.

---

[16] The contractual remedy of an injunction, as set out in section 8.3, is only for a breach of sections 8.1 or 8.2.

We affirm the trial court's order denying appellants' application for temporary injunction.


/s/      Martha Hill Jamison
         Justice


Panel consists of Justices Boyce, Jamison, and Busby.

18