

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00392-CV

_____

IN THE INTEREST OF J.V., A CHILD

On Appeal from the 89th District Court
Wichita County, Texas
Trial Court No. 13158-JR-C

Before Sudderth, C.J.; Gabriel and Wallach, JJ.
Memorandum Opinion by Justice Gabriel

# MEMORANDUM OPINION

Appellant K.G. (Mother) appeals the trial court's order terminating her parental rights to her daughter J.V. (Julia).[1]  In three issues, Mother contends the evidence was legally and factually insufficient to support termination under Family Code Section 161.001(b)(1)(N), the evidence was legally and factually insufficient to support the trial court's best-interest finding, and the trial court abused its discretion by not allowing Mother to present certain evidence at the de novo trial.  Because Mother failed to challenge the other predicate grounds for termination, because the evidence was legally and factually sufficient to support the trial court's best-interest finding, and because Mother waived her argument regarding the evidence she wanted to present at the de novo trial, we will affirm.

## I.  BACKGROUND

Mother had a lengthy history of illegal drug use.  She tried cocaine when she was fifteen and began using marijuana recreationally at seventeen or eighteen.  When she was around eighteen, she also began using ecstasy and Xanax.  At twenty, Mother began using methamphetamine.  Mother's drug problems became more serious when she began dating D.V. (Father) when she was around twenty-one.[2]  Father had a drug

---

[1]We use aliases to refer to the subject child and her family.  *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]The trial court terminated Father's parental rights to Julia after he signed a voluntary relinquishment of those rights.  Father does not appeal.

history of his own, and when Mother and Father were dating, they used methamphetamine daily. On two occasions while they were dating—once in August 2014 and another time in March 2016—police responded to reports that Father appeared to be overdosing on methamphetamine. Mother was with Father on both occasions. Julia was born in July 2017 when Mother was twenty-five. Mother claimed she did not use drugs while pregnant, but she admitted to using drugs after Julia was born.

Mother also had a criminal history involving, among other things, theft and drug possession. At eighteen, Mother was arrested and charged with theft of more than $50 but less than $500 after taking several items from a store without paying. Later that year, Mother was arrested and charged with driving while intoxicated after her vehicle struck another vehicle and she fled the scene. When asked about the incident, Mother told a police officer that the "she could not see because she did not have her contacts in, and that the brakes were out on her car"; police inspected the brakes, and they were working properly. Mother was under the influence of Xanax at the time of the DWI. At twenty-two, Mother was arrested and charged with theft under $50 after again stealing from a store. At twenty-three, Mother was arrested and charged with possession of a controlled substance after she was found with Xanax and Alprazolam. Two weeks after Julia was born, Mother was arrested and briefly jailed on a capias warrant for an underlying possession of marijuana charge.

Mother's problems were not limited to illegal drug use and criminal behavior. She also had a history of surrounding herself with romantic partners prone to committing acts of domestic violence. In June 2011, Mother was living in Denton with her boyfriend and called police because he "hurt her really bad." When police arrived at the scene, Mother explained that her boyfriend had been intoxicated and that when she entered the apartment they shared, he "slammed her head into [a] wall" and "pushed her down on the ground and hurt her arms." A police officer observed that Mother "had a mark on her right arm that ran from her wrist about halfway down the inside of her arm" and that resembled a "rug burn type injury." Mother's boyfriend told police that she had "been violent with him in the past." He was ultimately arrested for assault causing bodily injury family violence.

Domestic violence continued when Mother began dating Father. In December 2013, police officers were dispatched after witnesses saw Father and Mother arguing and saw Father pick Mother up and throw her to the ground. Mother told police that she and Father began arguing after she decided to leave their home. She said that Father shut the door as she was walking out of the home, and the door struck her head. When outside, Father grabbed her around the waist, picked her up, and threw her to the ground. Police observed that Mother had "a small bump on the back of her head from the door striking her." Mother told police that Father had assaulted her in the past but that she had not reported it because she did not want him to go to jail.

4

In March 2016, police were again dispatched to respond to a domestic violence scene involving Mother and Father. Mother told police that Father had been "acting very delusional recently due to constant prolonged methamphetamine usage." She explained that Father had woken her up from a nap, accused her of having sex with his brother, and began yelling at her. Mother tried to walk out the front door, but Father blocked the door and would not let her leave. Each time Mother reached for the door, Father "would physically knock her hands away to keep her from opening the door." Mother eventually was able to call her mother (Grandmother), and when Grandmother arrived at the scene, Mother was able to get outside. Once outside, Father attempted to grab Mother while Grandmother tried to shield Mother from Father. Father was able to push Mother to the ground. When police arrived at the scene, Father refused their commands, and police had to use a Taser to subdue him. Father was ultimately arrested and charged with assault family violence and unlawful restraint.

In May 2018—ten months after Julia was born—police were yet again dispatched to a domestic violence scene involving Mother and Father. Mother told police that they had been arguing and that Father told her that he was going to leave. As Father walked toward his vehicle, he pushed Mother to the ground.[3] Julia was

[3]When Mother wrote a report of the May 2018 incident a month later, she stated that the incident occurred after she told Father that she was going to take Julia and leave for a shelter. According to that account, Father told Mother that she was not going to leave, grabbed Julia, and pushed Mother to the ground.

present during this incident. The day after the incident, Mother and Julia went to First Step, a battered women's shelter. Mother filled out paperwork at the shelter indicating that Father had physically and emotionally abused her, had "[t]hreatened to take children away," and had treated her like a slave or servant. On a "Lethality Checklist," Mother indicated that she had been stalked, shoved, slapped, strangled, and burned.

Despite seeking refuge at the shelter, Mother and Julia soon made their way back to Father. On June 8, 2018, the Department of Family and Protective Services (the Department) removed Julia after Mother admitted during an interview that she and Father had smoked methamphetamine while Julia was in their home. Julia was given a drug test, and she tested positive for methamphetamine and amphetamine. Julia was eleven months old at the time. As a result of that positive drug test, Mother and Father were arrested and charged with abandoning or endangering a child. Mother was also given a drug test at the time of removal, and she tested positive for methamphetamine, amphetamine, and marijuana.[4] Later in the month, Father was given a drug test, and he tested positive for methamphetamine and amphetamine.

Following Julia's removal, the Department established a service plan for Mother. The service plan required that Mother, among other things: (1) complete

---

[4]While a drug test using a hair specimen collected from Mother on the day of removal revealed a positive result for marijuana, a test using a urine specimen revealed a negative result for marijuana.

individual therapy; (2) submit to random drug and alcohol tests; (3) avoid criminal activity and illegal drug use and avoid people involved in criminal activity or illegal drug use; (4) attend relationship and parenting classes at Common Ground Recovery Ministry; and (5) complete a program for victims of domestic violence at First Step. On August 7, 2018, the trial court approved the service plan and ordered that it be followed.

Mother did not comply with the service plan. Although her therapy sessions had an auspicious start—in the first few months of therapy, her counselor noted her positive attitude, willingness to engage in the therapy process, and a "significant amount of progress in her personal growth"—her attendance soon became inconsistent, and it stopped completely when her plans to join the military "fell through." In total, Mother missed twelve out of twenty-one scheduled therapy sessions. Her therapist noted that her sporadic attendance "appear[ed] to be reflective of her lifestyle" and that she had "regressed back into her old unhealthy behaviors as a means of coping with her emotional problems."

Mother indeed had regressed back to her old unhealthy lifestyle. While Mother's drug tests came back negative during August, September, and October 2018, Mother's December 2018 drug test came back positive for methamphetamine and amphetamine. Tests in March 2019 and April 2019 also came back positive for

methamphetamine and amphetamine.[5] Mother admitted to the trial court that she did not submit to all drug tests required by the Department and that she did not avoid criminal activities and illegal drug use as required by her service plan. Mother also continued her relationship with Father. In July 2018, Mother told her therapist that she had allowed Father back into her life because she believed he was a "changed man." In October 2018, Mother told her therapist that she believed Father had relapsed on drugs but that she had not asked him about it. Mother admitted to the trial court that she had not avoided people involved in criminal activity as required by her service plan.

To Mother's credit, she did complete the program for victims of domestic violence at First Step and the relationship course at Common Ground Recovery Ministry. Mother also took parenting classes at Common Ground Recovery Ministry but did not complete the course.

On May 30, 2019, Mother pleaded guilty to abandoning or endangering a child stemming from the incident where Julia tested positive for methamphetamine and amphetamine, and Mother was placed on three years of deferred adjudication community supervision. As part of Mother's community supervision, she was required to attend and successfully complete an eight-month inpatient

---

[5]The March 2019 test using a hair specimen came back positive for methamphetamine and amphetamine, while the March 2019 test using a urine specimen came back negative.

drug-and-alcohol recovery program at Hope Center Ministries. Mother was required to follow all rules and regulations of Hope Center Ministries while she was in the program. Mother had been admitted to the program on April 3, 2019, and she did well during the program's first month. On May 21, 2019, however, an incident occurred where Mother and another program participant drank alcohol, a violation of the program's rules. That incident occurred while Mother and the other participant were on a work assignment for the program in which they were tasked with detailing a customer's recreational vehicle, and Mother and the other participant found the alcohol and drank it without the customer's permission. Mother had to restart the program, which added two months to her program release date. At the time of the termination hearing, Mother's completion date was in January 2020, and her graduation date was in February 2020.

Following her removal, Julia was placed into Grandmother's care. Mother testified that Grandmother provided Julia with good care and that she believed Grandmother would continue to provide Julia with good care if that placement continued. Grandmother testified that she wanted to adopt Julia if Mother's rights were terminated. Kim Allison, a Child Protective Services caseworker, testified that the permanency plan with respect to Julia was that Mother's rights be terminated and Julia be adopted by Grandmother.

In its petition, the Department sought termination of Mother's parental rights to Julia based on the predicate termination grounds set forth in subsections E, N, and

9

O of section 161.001(b)(1) of the Family Code.  *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E), (N), (O).  Following an initial final hearing, the associate judge issued a ruling terminating Mother's parental rights under subsections E, N, and O. Mother requested a de novo hearing.  At the de novo hearing, Mother's counsel requested that she be allowed "to present new testimony and new evidence."  The trial court denied that request.  On September 25, 2019, following the de novo hearing, the trial court issued a ruling terminating Mother's parental rights under subsections E, N, and O.  Mother appeals from that order.

## II.  THE TRIAL COURT'S FINDING UNDER  SUBSECTION 161.001(b)(1)(N)

In her first issue, Mother argues that the evidence was legally and factually insufficient to support the termination of her parental rights under subsection 161.001(b)(1)(N).[6]  But Mother does not challenge the trial court's findings under subsections 161.001(b)(1)(E) or 161.001(b)(1)(O).  Because, along with a best-interest

---

[6]Although she frames her issue broadly—"The evidence was legally and factually insufficient to support the termination of [Mother's] parental rights"— Mother only discusses the insufficiency of the evidence as to subsection 161.001(b)(1)(N).  Mother does not argue that the evidence was insufficient as to subsections 161.001(b)(1)(E) or 161.001(b)(1)(O); thus, we do not construe her issue as complaining about the trial court's ruling with respect to those subsections. *See Petroleum Workers Union of the Republic of Mexico v. Gomez*, 503 S.W.3d 9, 24 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("Although we construe briefs liberally . . . we will not construct an argument where an appellant has not."); *LasikPlus of Tex., P.C. v. Mattioli*, 418 S.W.3d 210, 222 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ("Although we construe briefs liberally . . . we will not make appellants' arguments for them.").

finding, a finding of only one ground alleged under Section 161.001(b)(1) is sufficient to support termination, we overrule Mother's first issue. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re J.F.G., III*, 500 S.W.3d 554, 560 (Tex. App.—Texarkana 2016, no pet).[7]

## III.  THE TRIAL COURT'S BEST-INTEREST FINDING

In her second issue, Mother argues the evidence was legally and factually insufficient to support the trial court's finding that the termination of her parental rights was in Julia's best interest.

### A.  STANDARD OF REVIEW

In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013).  To determine whether the evidence is legally sufficient to support the trial court's best-interest finding, we look at all the evidence in the light most favorable to the

---

[7]Our decision to not address the sufficiency of the evidence to support the trial court's findings related to subsection 161.001(b)(1)(E) does not run afoul of the Texas Supreme Court's recent decision in *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam).  In this case, Mother does not challenge the trial court's subsection 161.001(b)(1)(E) finding, and the court in *N.G.* made it clear that its holding that a reviewing court must review subsections 161.001(b)(1)(D) and 161.001(b)(1)(E) even when another statutory ground sufficiently supports termination is predicated on the party's having challenged those grounds on appeal.  *Id.*; *see In re K.A.*, No. 02-19-00099-CV, 2019 WL 4309168, at *11 n.4 (Tex. App.—Fort Worth Sept. 12, 2019, pet. denied) (mem. op.) (holding that decision to not address the sufficiency of the evidence with respect to subsections 161.001(b)(1)(D) and 161.001(b)(1)(E) did not run afoul of *N.G.* where appellant did not challenge the trial court's findings with respect to those subsections).

challenged finding to determine whether a reasonable fact-finder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005); *see* Tex. Fam. Code Ann. § 161.001(b)(2). We assume that the fact-finder settled any evidentiary conflicts in favor of its finding if a reasonable fact-finder could have done so. *J.P.B.*, 180 S.W.3d at 573. We disregard all evidence that a reasonable fact-finder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable fact-finder could, and we disregard contrary evidence unless a reasonable fact-finder could not. *See id.*

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the fact-finder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a fact-finder could reasonably form a firm conviction or belief that the termination of Mother and Julia's parent–child relationship would be in Julia's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the fact-finder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient to support the best-interest finding. *C.H.*, 89 S.W.3d at 18–19.

12

## B. APPLICABLE LAW

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). Evidence probative of a child's best interest may be the same evidence that is probative of a conduct ground. *E.C.R.*, 402 S.W.3d at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1). We also consider the evidence in light of nonexclusive factors that the trier of fact may apply in determining the child's best interest:

(A)   the child's desires;

(B)   the child's emotional and physical needs, now and in the future;

(C)   the emotional and physical danger to the child now and in the future;

(D)   the parental abilities of the individuals seeking custody;

(E)   the programs available to assist these individuals to promote the child's best interest;

(F)   the plans for the child by these individuals or by the agency seeking custody;

(G)   the stability of the home or proposed placement;

(H)   the parent's acts or omissions indicating that the existing parent-child relationship is not a proper one; and

(I)   any excuse for the parent's acts or omissions.

13

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

### C. BEST-INTEREST ANALYSIS

With regard to Julia's desires, the record reflects that Julia was two years old at the time of the de novo hearing and did not testify. When children are too young to express their desires, the fact-finder may consider whether the children have bonded with their current caregiver, are well-cared for by them, and have spent minimal time with the parent. *In re V.B.*, No. 02-17-00318-CV, 2018 WL 771976, at *7 (Tex. App.—Fort Worth, Feb. 8, 2018, no pet.) (mem. op.); *In re S.R.*, 452 S.W.3d 351, 369 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). The evidence reflects that Julia has been with Grandmother since her removal from Mother and that Julia is doing well in Grandmother's care. Mother testified that Grandmother was providing Julia with good care, the record reflects that Grandmother ensured that Julia received medical and dental care, and Grandmother expressed a desire to adopt Julia. The evidence also reflects that Mother has spent minimal time with Julia. Julia was

14

removed from Mother's care in June 2018, eleven months after Julia was born. Evidence was also presented that Mother had had the opportunity for approximately fifty-two possible visits with Julia but that she had missed the majority of those visits.[8] The trial court was entitled to find that this factor weighed in favor of terminating Mother's parental rights to Julia.

With regard to Julia's emotional and physical needs now and in the future and the emotional and physical danger to Julia now and in the future, the record reflects that while in Mother's care, Julia tested positive for methamphetamine and amphetamine. The record further reflects that Mother has a history of drug use, and a particularly lengthy history of methamphetamine use, including methamphetamine use after Julia's removal. Mother admitted that she had knowingly placed Julia in situations that endangered her physical and emotional wellbeing. The record also reflects that Mother continued to allow Julia to be around Father, even though Father had a history of drug use—including two overdoses that required police attention—and numerous instances of domestic violence against Mother. Mother admitted that Father had used methamphetamine in front of Julia, and she admitted that she had known Father was unsafe before Julia was born, but that she had not kept Julia away from him. In contrast to the evidence that Julia was endangered while in Mother's care, the record reflects that Julia was well-cared for in Grandmother's care—Mother

---

[8]Mother's bond conditions following her arrest for abandoning or endangering a child prohibited Mother from having contact with Julia.

herself admitted that Julia received good care from Grandmother. The trial court was entitled to find that these factors weighed in favor of terminating Mother's parental rights to Julia.

With regard to Mother's parental abilities and the programs available to assist her in promoting Julia's best interest, the record reflects that Mother had a substance abuse problem that spanned her entire adult life and that she surrounded herself with violent and unstable romantic partners. While Mother had numerous opportunities to prove that she could turn her life around and be a good parent to Julia, she did not avail herself of those opportunities. She missed twelve out of twenty-one scheduled therapy sessions, she failed multiple drug tests after removal, she had to restart the program at Hope Center Ministries after drinking a customer's alcohol, and she continued to make her way back to Father even though she knew that he was unsafe for Julia. Mother admitted that she had not "been a mother to Julia," that it was her own fault, and that she was trying to fix herself. While Mother was making attempts to fix herself—she completed some programs and several parenting classes—the trial court could have reasonably determined that those attempts were too little and too late, given the overwhelming evidence of Mother's poor choices over her lifetime. The trial court was entitled to find that these factors weighed in favor of terminating Mother's parental rights to Julia.

With regard to the plan for Julia by the individuals seeking custody, the record reflects that Mother was required to complete a drug and alcohol recovery program at

Hope Center Ministries. Because the program was an in-patient program, Mother acknowledged that she could not maintain a home for Julia until she was released from the program. Due to the fact that Mother had to restart the program, her completion date was moved to January 2020, and her graduation date was moved to February 2020. Mother also testified that she was not working because her employment had been terminated following the incident where she drank the customer's alcohol. Grandmother testified that she wanted to adopt Julia, and a CPS caseworker testified that the permanency plan called for Julia to be adopted by Grandmother. The trial court was entitled to find that this factor weighed in favor of terminating Mother's parental rights to Julia.

With regard to the stability of the home or proposed placement, the record reflects that Mother had a substance abuse problem that caused instability in her life. Mother's substance abuse problem led to multiple arrests, led to Mother being briefly imprisoned on a capias warrant just two weeks after Julia was born, led to Mother's required eight-month stay at an inpatient drug-and-alcohol recovery program, and led to Julia's removal from Mother's care. The record also reflects that Mother was only consistent in her inconsistency: her therapist noted Mother's great progress early in the case, only to note that she later "regressed back into her old unhealthy behaviors"; she passed drug tests in the months following removal but soon thereafter had multiple failed tests; she was making progress at Hope Center Ministries until the incident with the alcohol which caused her to restart the program; and she made

17

several attempts to distance herself from Father but always made her way back to him. In contrast to the instability demonstrated by Mother, Julia has remained in Grandmother's care since removal, and the record reflects that Julia is well-cared for and that Grandmother desires to adopt her. The trial court was entitled to find that this factor weighed in favor of terminating Mother's parental rights to Julia.

With regard to Mother's acts or omissions indicating that the existing parent-child relationship is not a proper one and any excuse for Mother's acts or omissions, the record reflects that Julia was removed because Mother and Father were smoking methamphetamine in the family's home and that Julia tested positive for methamphetamine. The record also reflects that Mother admitted that she had knowingly placed Julia in situations that endangered her physical and emotional wellbeing and had allowed Julia to be around Father even though Mother knew that he was unsafe. The record further reflects that Mother continued to use drugs following Julia's removal. Mother does not offer any excuse for these actions; rather, she admits that because of her faults, she has not been able to be a mother to Julia. The trial court was entitled to find that these factors weighed in favor of terminating Mother's parental rights to Julia.

### D.  BEST-INTEREST CONCLUSION

Viewing the evidence in the light most favorable to the trial court's best-interest finding, we hold that a reasonable fact-finder could have reasonably formed a firm conviction or belief that termination of the parent-child relationship between

Mother and Julia was in Julia's best interest, and we therefore hold that the evidence is legally sufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *J.P.B.*, 180 S.W.3d at 573. Based on our exacting review of the entire record and giving due deference to the fact-finder's findings, we likewise conclude that the evidence is factually sufficient to support the trial court's best-interest finding. *See C.H.*, 89 S.W.3d at 18–19. Accordingly, we overrule Mother's second issue.

## IV. THE TRIAL COURT'S EXCLUSION OF EVIDENCE

In her third issue, Mother argues that the trial court abused its discretion by not allowing her to present new evidence at the de novo hearing. Mother contends in her brief that this evidence "would cover a time period from the date the de novo hearing was requested to the date the de novo hearing was held" and that it would contradict the best-interest finding.

"'[W]hen evidence is excluded by the trial court, the proponent of the evidence must preserve the evidence in the record in order to complain of the exclusion on appeal,' and failure to do so results in waiver of the complaint." *Dillard v. North Hills Manor*, No. 02-18-00309-CV, 2019 WL 5089759, at *2 (Tex. App.—Fort Worth Oct. 10, 2019, no pet.) (mem. op.) (quoting *Bobbora v. Unitrin Ins. Servs.*, 255 S.W.3d 331, 335 (Tex. App.—Dallas 2008, no pet.)). To preserve the evidence in the record, the proponent must submit an offer of proof or make a bill of exception. *See* Tex. R. Evid. 103; Tex. R. App. P. 33.1(a)(1)(B), 33.2; *Dillard*, 2019 WL 5089759, at *2.

Here, Mother's counsel requested that she be allowed "to present new testimony and new evidence" at the de novo hearing. The trial court denied that request. Mother, however, did not submit an offer of proof or make a bill of exception with respect to the excluded evidence, and we are left to guess as to its substance and what it might prove. Thus, Mother has waived her third issue by failing to preserve in the record the substance of the evidence that the trial court excluded. *See* Tex. R. Evid. 103; Tex. R. App. P. 33.1(a)(1)(B), 33.2; *Dillard*, 2019 WL 5089759, at *2. We overrule Mother's third issue.

## V. CONCLUSION

Having overruled Mother's three issues, we affirm the trial court's termination order.

/s/ Lee Gabriel

Lee Gabriel
Justice

Delivered: April 1, 2020