**Affirmed and Opinion filed July 14, 2015.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-14-00461-CV

_____

**HSIN-CHI-SU AKA NOBU SU, Appellant**

**V.**

**VANTAGE DRILLING COMPANY, Appellee**

**On Appeal from the 295th District Court
Harris County, Texas
Trial Court Cause No. 2012-47755**

## O P I N I O N

Appellee, Vantage Drilling Company ("Vantage"), sued appellant, Hsin-Chi-Su aka Nobu Su ("Su"), seeking, *inter alia*, to recover Vantage shares held by Su's wholly-owned affiliate, F3 Capital, on the ground the stock was acquired via Su's fraud and breach of fiduciary duties. The trial court signed a temporary injunction precluding Su from disposing of, or otherwise encumbering, the shares pending final judgment.

In five appellate issues, Su attacks the merits of the injunctive relief and the amount of the temporary-injunction bond that Vantage was ordered to post. Su has also filed in our court a "Motion to Void State Court Proceedings, Or Alternatively Motion To Increase Temporary Injunction Bond Pending Interlocutory Appeal of Injunction Order." We ordered the motion taken with the case. We deny the motion and affirm the temporary injunction.

## I. BACKGROUND

### A. Factual History[1]

Vantage was formed in 2006 as a special-purpose-acquisition entity to acquire drilling assets for lease to oil-and-gas operators.[2] Vantage sought to acquire jack-up rigs and ultra-deepwater drillships because it discerned a need for those assets in the industry. In 2007, Vantage officers were introduced to Su, a shipping magnate. Su, through his affiliates, had deals in place to build the type of assets that Vantage sought to acquire.

### 1. The Transactions

Vantage and Su or his affiliates entered into multiple transactions, including the following:[3]

---

[1] Consistent with our applicable standard of review, we set forth the factual history based on viewing the evidence in the light most favorable to the trial court's ruling. *See LasikPlus of Tex., P.C. v. Mattioli*, 418 S.W.3d 210, 216 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

[2] The special-purpose-acquisition status permits a business to raise funds for an acquisition through an initial public offering of shares. The funds are placed in trust pending identification of an acquisition. Once shareholders approve the targeted acquisition, the money is removed from the trust to fund the acquisition. Vantage's founders invested millions of their own funds and raised millions through an initial public offering in May 2007.

[3] Many of the transactions or Su's underlying deals were entered into by affiliates directly or indirectly controlled by Su. For ease of discussion, we will refer to each such entity as Su's "affiliate," except when necessary to specifically identify the affiliate, because, for the most part, the affiliate's identity is not material to our disposition of this appeal.

2

*July 2007 Memorandum of Understanding*

In July 2007, Vantage and Su executed a non-binding Memorandum of Understanding expressing their intent that Su or his nominee would sell Vantage two jack-up rigs and an option to acquire an ultra-deepwater drillship—the *Platinum Explorer*. That document set forth the contemplated consideration for the sale: (1) Vantage would pay $440 million for the jack-up rigs, including $145 million in Vantage shares and warrants payable to Su or his nominee; (2) Vantage would pay $660 million for the drillship option, with 30% due upon exercise of the option and 70% due upon delivery of the ship; and (3) Su and his representative would receive seats on the Vantage board of directors.

According to Vantage, Su represented that this 30/70 payment structure for the drillship option would correspond with the payment structure on his underlying contract with Daewoo Shipbuilding & Marine Engineering ("Daewoo") for construction of the ship. For example, when Vantage paid 30% upon exercising its option, Su would have paid 30% to Daewoo, thereby making Su effectively a "pass through" for payments. These representations regarding the corresponding payment structures were material to Vantage because they affected its ability to obtain financing for the purchase. Specifically, the fact that payments would have already been made to Daewoo when Vantage made its payments to Su would guarantee Vantage a refund from Daewoo if it defaulted on delivery of the ship; in contrast, financers would detect an unnecessary risk with respect to Vantage receiving a refund in the event of a Daewoo default if payments had been made to Su only. Vantage maintains that Su knew this aspect of corresponding payment structures was material to Vantage because it is a common concept in the ship-building industry.

3

Su then formed F3 Capital to receive the shares of Vantage stock to be transferred in the transaction. Su is F3 Capital's sole shareholder, sole director, and president. F3 Capital's sole assets are the Vantage shares and some funds owed to it by the U.S. Government.

### *August 2007 Share Purchase Agreement*

In August 2007, a Share Purchase Agreement was executed between Vantage and a Su affiliate, which held the underlying contracts to build the jack-up rigs. This agreement formalized and expanded the Memorandum of Understanding. Under the agreement, Vantage would purchase the jack-up rigs (now four rigs) by (1) transferring $275 million worth of Vantage stock and warrants to F3 Capital upon closing of the purchase, (2) paying $56 million in cash, and (3) assuming $517 million due on the underlying construction contracts for the rigs. The parties also agreed that Vantage and another Su affiliate would execute an option contract for the *Platinum Explorer* by the date for closing the purchase of the jack-up rigs—with the option exercisable within six months after the closing.

### *November 2007 Letter of Intent for Drillship Option*

In November 2007, Vantage and another Su affiliate entered into a Letter of Intent specifying further details for purchase of the *Platinum Explorer*. These details again called for an initial down payment of 30% of the $660 million purchase price upon exercise of the option and the remainder due on delivery of the ship. According to Vantage, its representatives again relied on Su's representations that this payment structure corresponded with the payment structure for the underlying contract with Daewoo.

4

***March 2008 Drillship Purchase Agreement***

Instead of an option contract, in March 2008, Vantage and a Su affiliate entered into an agreement for Vantage to outright purchase the *Platinum Explorer* from the affiliate for $676 million. The agreement required Vantage to make a 30% down payment on September 13, 2008 and remit the remaining 70% upon delivery of the ship in November 2010. The agreement also provided that Su retained control over the underlying Daewoo contract, including ensuring that it would be paid timely. Additionally, Su's affiliate agreed to perform all actions necessary to consummate the transactions with Vantage, which would include cooperating in Vantage's financing efforts and disclosing the terms of the Daewoo contract. That aspect was important to Vantage because it was relinquishing control over the Daewoo contract, yet, as explained above, the fact that Vantage's payments to Su's affiliate would correspond with his payments to Daewoo was vital to obtaining financing. However, Su provided only a redacted version of the Daewoo contract, which lacked details regarding when payments were due, while he continued to represent the Daewoo contract's payment structure was the same as the 30/70 payment structure in the March 2008 Drillship Purchase Agreement between Su's affiliate and Vantage.

The Drillship Purchase Agreement also gave Vantage the option to purchase a second ultra-deepwater drillship, the *Titanium Explorer*, under construction by Daewoo.

The Share Purchase Agreement and the Drillship Purchase Agreement closed on June 12, 2008. Upon closing, F3 Capital received $275 million in Vantage stock and warrants, thereby owning 40% of its shares, plus $56 million in cash. Su joined the Vantage board of directors and gained the right to nominate two additional members of the nine-member board.

## 2. Post-closing Events

After the closing, Vantage began preparing a road show to obtain financing for its obligation to make a 30% down payment toward purchase of the *Platinum Explorer*. However, Su, who was now a fiduciary, took actions which Vantage characterized as detrimental to its financing efforts and its interests in general.[4]

In particular, despite repeated requests, Su still refused for several months to provide a complete copy of the Daewoo contract and provided only a redacted copy which lacked payment terms. Su claimed he had a special arrangement with Daewoo to keep the terms secret. Vantage informed Su that such refusal would harm Vantage's ability to obtain financing. According to Vantage, Su also tied his willingness to provide the complete Daewoo contract and otherwise comply with his affiliates' contractual obligations to attempts to re-trade the parties' agreements.

For instance, Su repeatedly demanded early remittance of some or all of the down payment, although it was not due until September 13, 2008. The first demand was actually made shortly before the closing when Su demanded the entire down payment ($200 million) immediately after the closing—when the special-purpose-acquisition funds were to be released. Vantage responded that early payment was impossible because (1) financers would require the funds be paid directly to Daewoo and view payment under Su's proposal as preferential and not arm's length, and (2) the SEC would frown on a substantial advance payment to a party who controlled 40% of Vantage's shares and would likely remove the board.

During July and August 2008 (after the closing), Su requested respectively (as each request was refused by Vantage) that it pay $46 million, then $30 million,

---

[4] Su acknowledges he was a Vantage fiduciary once he became a board member.

and then "3 weeks funding" in exchange for Su pledging some Vantage shares held by F3 Capital. When refusing, Vantage replied that prepayment was impossible because existing funds were earmarked for purchase of the jack-up rigs but it was working on obtaining the funds for the *Platinum Explorer* down payment. Then, Su threatened that unless he received an advanced payment, he would not transfer to Vantage the right to decide specifications for the drillship, to which Vantage was entitled under the Drillship Purchase Agreement. Vantage responded that such a position would be a breach of Su's fiduciary duties to Vantage and the agreement.

In late August 2008, several days before Vantage was scheduled to begin its financing roadshow, Su proposed changing the parties' agreement regarding the option for the second drillship—the *Titanium Explorer*. Instead of an option to purchase, Su proposed a a 50% joint-venture. Vantage replied that it would further discuss the proposal regarding the second drillship but it was concentrating on obtaining financing for the *Platinum Explorer*. Su then refused to provide the Daewoo contract unless Vantage agreed to the proposal regarding the *Titanium Explorer*. Vantage rejected the proposal and replied that Su's position would clearly frustrate financing for the *Platinum Explorer*.

One day before the scheduled roadshow, Su provided a complete copy of the Daewoo contract. Vantage learned that the payment structure under the Daewoo contract did **not** comport with the structure for Vantage's payments. Rather, the Daewoo contract called for four installments of 5% (approximately $32 million each) and a final 80% payment on delivery—not the 30/70 arrangement as represented. Vantage also learned that Su had paid only one of the $32 million installments with the next due in September 2008. These revelations were detrimental to Vantage's ability to obtain financing because (1) as explained

7

above, the disparity between payment structures would preclude the shipyard guarantee, and (2) when Vantage paid Su its $200 million down payment due on September 13, 2008, Su would have paid only $64 million to Daewoo, thus effectively providing Su with a $136 million interest-free loan. Despite what it viewed as misrepresentations by Su, Vantage proposed alternatives to salvage the financing effort because acquiring the *Platinum Explorer* was critical to its operations. However, Su rejected the proposals, Vantage's efforts to obtain financing were "dead," and its reputation in the financing community was damaged.

Consequently, Vantage was unable to make its down payment on September 13, 2008. According to Vantage, it could have made the payment and consummated the transaction if Su's representations about the Daewoo contract had been correct. Su was also unable to make his $32 million payment due to Daewoo at the same time. Su demanded that Vantage advance the $32 million and insisted Daewoo would not defer the due date. Because salvaging the purchase was vital to Vantage's ability to enter the drillship business, it provided the $32 million from funds earmarked for purchase of the jack-up rigs, thereby harming its relationship with the lenders for those rigs. At Su's insistence, Vantage paid the $32 million directly to Su rather than to Daewoo. Vantage eventually discovered that Su had actually obtained a deferral from Daewoo until late October 2008. Consequently, Su obtained an interest-free loan for $32 million from Vantage.

In mid-November 2008, Vantage agreed to modify the Drillship Purchase Agreement at Su's demand. According to Vantage, modification would have been unnecessary and undesirable if Su had not harmed the financing efforts for the original agreement. Under the modified agreement, instead of Vantage owning 100% of the ship (per the original agreement), it would be owned by a joint

8

venture with Vantage controlling 45% and a Su affiliate controlling 55%. As consideration, a Su affiliate received an additional $149.75 million, F3 Capital exercised warrants to acquire an additional 25 million Vantage shares, and F3 Capital received an additional 1.9 million warrants to acquire more shares. In exchange, Su agreed to pay all remaining progress installments on the Daewoo contract plus 55% of remaining costs associated with the ship.

Subsequently, Su was unable to make those payments but attempted to obtain more shares and loans from Vantage to meet his obligations. Vantage bought Su's 55% interest to avoid defaulting on the Daewoo contract and risking "catastrophic" consequences if Vantage were unable to deliver on its contracts with drillers. The consideration included a $60 million promissory note to Su, which was still outstanding at the time of the temporary-injunction hearing. Vantage eventually owned 100% of the *Platinum Explorer* when all was completed. In April 2011, Su resigned from Vantage's board.

## B.    Procedural History

In August 2012, Vantage sued Su in state court for fraud, breach of fiduciary duty, and unjust enrichment. Vantage claims that Su wrongfully induced Vantage to issue approximately 100 million shares of its stock to Su through F3 Capital. Vantage seeks damages, plus a constructive trust over, and disgorgement of, all profits realized by Su from the transactions, including the Vantage shares.

Su invoked diversity of citizenship to remove the case to federal court, but the case ultimately was remanded to the state court. Vantage then filed an application for temporary injunction seeking to enjoin Su from disposing of the shares pending final judgment. The application was prompted by Su's actions during the removal period of pledging numerous shares for debts of other entities that he controlled.

The trial court conducted a hearing on the application. On June 11, 2014, the trial court signed a temporary injunction, ruling as follows with respect to 72,238,972 shares of Vantage stock "[Su] holds through F3 Capital":

> The Court **ORDERS** [Su], individually or by / through his officers, agents, servants, employees, attorneys, and those persons in active concert or participation, enjoined from taking any action to sell, transfer, pledge, hypothecate, or otherwise encumber any of the Shares pending final judgment of in [sic] this case.

> The Court **ORDERS** [Su] acting by or through F3 Capital's officers, agents, servants, employees, attorneys, and those persons in active concert or participation, enjoined from taking any action to sell, transfer, pledge, hypothecate, or otherwise encumber any of the Shares pending final judgment of in [sic] this case.

In the order, the trial court recited findings of fact, which we will discuss in more detail when addressing the issues on which the various findings are relevant. The trial court also ordered Vantage to post a bond in the amount of $125,695.81. Su filed this interlocutory appeal. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4) (West, Westlaw through 2015 R.S.).

## II. JURISDICTION

We will first address the portion of Su's appellate motion contending the trial court lacked subject matter jurisdiction to issue the temporary injunction because, at that time, the federal court had not yet remanded the case.

In October 2012, Su removed the case to federal court. In April 2013, the federal district court denied Vantage's motion to remand. On January 7, 2014, the Fifth Circuit issued an opinion reversing the district court's order denying remand. On January 21, 2014, the district court signed a remand order. On January 23, 2014, the district court vacated that remand order. The Fifth Circuit issued the mandate on January 29, 2014. The district court did not sign another remand order at that time. Thereafter, the proceedings continued in the state court with both

parties filing various pleadings. When the trial court signed the temporary injunction on June 11, 2014, the federal district court had not yet signed another remand order.

Su argues that the temporary injunction is void because the federal district court had not yet remanded the case when the trial court signed the temporary injunction. Su characterizes his complaint as a challenge to the trial court's subject matter jurisdiction, which may be raised for the first time on appeal. As Su acknowledges, on September 4, 2014 (a few days after he filed his appellate motion), the federal district court signed a remand order. Nonetheless, Su continues to argue the trial court lacked jurisdiction to take any actions, including signing the temporary injunction, between the removal and the September 4th remand order.[5] We disagree.

Federal law provides as follows regarding remand procedures:

> If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded. . . . A certified copy of the order of remand shall be mailed by the clerk to the clerk of the State court. The State court may thereupon proceed with such case.

28 U.S.C. 1447(c).

Su correctly asserts that, when the trial court signed its temporary injunction, the federal district court had not signed a remand order to be mailed to the state

---

[5] Not all of the pertinent documents in the federal court proceeding are part of the clerk's record in this appeal. However, certified or sworn copies of the documents are attached to Su's appellate motion and Vantage's response. Both parties rely on these attachments and do not dispute they are accurate copies. Accordingly, we grant Vantage's request that we take judicial notice of the documents in order to decide whether the trial court had jurisdiction. *See Freedom Commc'ns, Inc. v. Coronado*, 372 S.W.3d 621, 623–24 (Tex. 2012) (per curiam) (stating, "a court will take judicial notice of another court's records if a party provides proof of the records"); *see also* Tex. R. Evid. 201(b) (providing appellate court may take judicial notice of a relevant fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

clerk because the court had vacated the one order it did sign. However, we agree with Vantage that (1) the case was effectively remanded despite the lack of compliance with section 1447(c), and (2) because that provision is procedural rather than jurisdictional, Su waived his complaint by failing to object and by continuing to participate in the state-court proceedings.

Vantage cites *Gonzalez v. Guilbot*, 315 S.W.3d 533, 536 (Tex. 2010), in which the defendants argued that a state court's judgment and sanctions order were void because jurisdiction had not re-vested in state court following remand from a federal court. Instead of mailing the remand order to the state clerk as required under section 1447(c), the federal clerk gave the order to plaintiff's counsel who delivered it to the state court. *Id.* at 535, 536–37. The supreme court held that hand-delivery of the remand order successfully transferred jurisdiction back to the state court because the federal court expressed its "unmistakable intention to divest itself of jurisdiction and return jurisdiction to the state court." *Id.* at 538.

Unlike in *Gonzalez*, there was no remand order signed in the present case until after the trial court signed its temporary injunction. Regardless, the federal court had clearly intended to divest itself of jurisdiction. There was nothing left to be resolved in the federal courts on the remand issue because the Fifth Circuit had issued its opinion requiring remand and its mandate. The only remaining action that could properly occur in the federal proceeding was the federal district court signing a remand order as a ministerial act and the clerk mailing that order to the state court clerk. The district court vacated its original remand order only because the mandate had not issued—not because the court intended to retain jurisdiction and make further rulings despite the Fifth Circuit's decision. *See Direct Mortg. Corp. v. Keirtec, Inc.*, 478 F. Supp. 2d 1339, 1341 (D. Utah 2007) (stating procedural devices of removal and remand are designed to ensure only one court

12

exercises jurisdiction over case at any given time, which prevents inconsistent rulings and duplicitous work and preserves judicial and party resources). And, although the effective remand order was ultimately signed after the trial court signed the temporary injunction, that remand order confirms the federal court intended to divest itself of jurisdiction. Accordingly, it is "unmistakable" that when the trial court signed the temporary injunction, the federal court had intended to remand. *See Gonzalez*, 315 S.W.3d at 538.

Vantage further cites authority recognizing a contention that remand was not effected in compliance with the federal requirements is a procedural complaint which may be waived. When the *Gonzalez* court held jurisdiction had re-vested in the state court, it also relied on the fact that the defendants resumed litigation in the state court with full knowledge of the remand, although the *Gonzalez* court did not expressly use the term "waiver." *See id.* at 538–39; *see also* Tex. R. App. P. 33.1(a) (providing, to preserve error, party must present the complaint to the trial court via timely objection or request and obtain a ruling); *Tellez v. City of Socorro,* 226 S.W.3d 413, 414 (Tex. 2007) (per curiam) (recognizing, although lack of subject matter jurisdiction may not be waived and may be raised at any time, a party waives a procedural complaint by failing to object in the trial court).

As another example, in *Keirtec*, the defendant removed the case to federal court. 478 F. Supp. 2d at 1340. However, the defendant then "stood silent" while other parties filed pleadings in the state court and that court issued orders. *Id.* at 1340–41. The federal court held that it must remand because the defendant had impliedly consented to jurisdiction in state court. *See id.* at 1341–42. Unlike in *Keirtec*, the parties in the present case did not continue to litigate in state court **while** the case was removed to federal court. Nonetheless, *Keirtec* supports a

13

conclusion that Su consented to the state court's jurisdiction **once** the Fifth Circuit issued its mandate requiring remand by resuming litigation in the state court.

Since that mandate, Su has affirmatively litigated the matter in state court via the following actions: (1) filing a counterclaim which asserts the trial court has jurisdiction and requests damages; (2) filing an answer and requests for disclosure; (3) subpoenaing witnesses for a hearing scheduled on the application for temporary injunction; and (4) filing a response to the application. Moreover, the record does not reflect that Su ever complained in the trial court that no remand order had been signed. Su first raises the issue in his appellate motion. Thus, Su waived his complaint that the case was not remanded in compliance with federal procedures.

Accordingly, because the case was remanded, the trial court had jurisdiction to sign the temporary injunction. We overrule the portion of Su's appellate motion contending the trial court lacked jurisdiction and turn to his challenges to the merits of the temporary injunction.

### III. TEMPORARY INJUNCTION

The purpose of a temporary injunction is to preserve the status quo of the subject matter of the litigation pending a trial on the merits. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). A temporary injunction is an extraordinary remedy and does not issue as a matter of right. *Id.* To obtain a temporary injunction, the applicant must plead and prove (1) a cause of action against the defendant, (2) a probable right to the relief sought, and (3) a probable, imminent, and irreparable injury in the interim. *Id.*

The applicant is not required to establish that it will prevail at a trial on the merits. *Sharma v. Vinmar Int'l, Ltd.,* 231 S.W.3d 405, 419 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (citing *Walling v. Metcalfe,* 863 S.W.2d 56, 58

14

(Tex.1993)). The merits of the applicant's suit are not presented for review. *Id.* Instead, we strictly limit our review to whether the trial court clearly abused its discretion in granting the temporary injunction. *See Butnaru*, 84 S.W.3d at 204; *Sharma*, 231 S.W.3d at 419. We may not reverse a temporary injunction unless the trial court's decision was so arbitrary that it exceeded the bounds of reasonable discretion. *Butnaru,* 84 S.W.3d at 204; *Sharma*, 231 S.W.3d at 419. If some evidence reasonably supports the trial court's decision, there is no abuse of discretion. *Butnaru,* 84 S.W.3d at 211. We view the evidence in the light most favorable to the trial court's order, indulging every reasonable inference in favor of the ruling. *LasikPlus of Tex., P.C. v. Mattioli*, 418 S.W.3d 210, 216 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

The trial court recited in its order that Vantage satisfied the above-cited elements. Su challenges the injunction on four grounds: (1) the order enjoined F3 Capital, a non-party; (2) Vantage failed to prove a probable right to the relief sought; (3) Vantage failed to establish a probable, imminent, and irreparable injury in the interim; and (4) collateral estoppel barred the relief.

## A.    Injunction implicating F3 Capital

The trial court enjoined actions undertaken by Su individually and "by or through" F3 Capital to dispose of the Vantage shares. In his first issue, Su contends the trial court abused its discretion by enjoining F3 Capital because it is not a named party to this suit. However, as Vantage asserts, the trial court did not directly enjoin F3 Capital as the order applied directly to Su. Yet, Su suggests the trial court improperly issued an injunction affecting the property of a non-party because the shares are held by F3 Capital.

Su cites Texas Rule of Civil Procedure 124, which provides: "In no case shall judgment be rendered against any defendant unless upon service, or

15

acceptance or waiver of process, or upon an appearance by the defendant, as prescribed in these rules, except where otherwise expressly provided by law or these rules." Tex. R. Civ. P. 124. But the trial court did not render "judgment" against Su or F3 Capital, but rather a temporary injunction. The rules governing injunctive relief provide that an injunction "is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, **and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise**." Tex. R. Civ. P. 683 (emphasis added).

The trial court's findings indicate, and the evidence supports, that F3 Capital was "in active concert or participation with Su" relative to acquisition of, and attempts to dispose of, the Vantage shares. It is undisputed Su is the sole director, shareholder, and officer of F3 Capital, and thus all actions of F3 Capital are controlled wholly by Su. As further discussed below, Vantage presented evidence that Su obtained the shares held by F3 Capital through fraud or breach of fiduciary duties. Additionally, Su's own actions reflect that he has treated the F3 Capital shares as subject to his ownership and control and disposed of, or attempted to dispose of, some shares for his own purposes: (1) he has personally filed a counterclaim against Vantage and its representatives, alleging their actions caused a significant decrease in the value of the shares; (2) shortly after closing the transactions, Su promised to pledge shares in return for Vantage advancing the early payments demanded by Su; and (3) Su pledged shares for obligations and debts of his various affiliates that were unrelated to the transactions at issue. Finally, F3 Capital "otherwise" received actual notice of the temporary injunction by virtue of Su (F3 Capital's sole director, shareholder, and officer) having

16

received notice.  Accordingly, the injunction is permissibly binding on assets held by F3 Capital.  *See id.*  We overrule Su's first issue.

**B.      Whether Vantage proved a probable right to the relief sought**

In his second issue, Su argues Vantage failed to prove a probable right to the relief sought in this suit because (1) Vantage cannot prevail at trial on the equitable theory relied on by the trial court when issuing the injunction, and (2) Vantage may not recover shares from F3 Capital for its claims against Su.

**1.      Whether Vantage established a theory for recovery of the shares**

In its pleading, Vantage requested disgorgement of, or a constructive trust over, the shares based on Su's fraud and breach of fiduciary duties.  The trial court found that Vantage proved a probable right to recover the shares via one of these equitable remedies.  The following findings are relevant to this issue:

3.  Mr. Su, acting individually and/or by or through F3 Capital and several affiliates, entered into a series of transactions with Vantage, including [listing the four pre-closing transactions outlined above].

4.  Mr. Su's representations regarding the payment terms of the agreement with [Daewoo] were material to Vantage's decision to enter into the Transactions.

5.  Vantage relied on Mr. Su's representations when it entered into the Transactions.

6.  On June 12, 2008, in reliance on Mr. Su's representations, Vantage closed the Transactions and, at Mr. Su's direction, paid consideration including warrants to Vantage common stock to Mr. Su's wholly-owned, solely controlled affiliate F3 Capital.

7.  On June 12, 2008, Mr. Su became a Director on the Board of Directors of [Vantage] and in that capacity, obtained rights to nominate two other board members.

8.  Vantage has made a prima facie case that following his appointment to the Vantage Board[,] Mr. Su breached his fiduciary duty to Vantage by not complying with his obligations under the Transactions.

17

9.    Vantage has made a prima facie case that, in communications made in August 2008, Mr. Su, as a Vantage Director, breached his fiduciary duty, frustrating Vantage's ability to obtain financing for existing transactions that were essential to the viability of the company.

10.   Vantage has made a prima facie case that Mr. Su's actions were designed to retain his Vantage stock holdings and obtain additional cash and other benefits.

11.   Vantage has made a prima facie case that Mr. Su's breach of fiduciary duty benefited him directly and is traceable to the Stocks.

12.   If Vantage obtains a final judgment against Mr. Su, it may be entitled to recover the Shares awarded in consideration for the Transactions through the imposition of an order of disgorgement or comparable equitable relief either in this action or in a subsequent enforcement action against F3 Capital or other transferees of the Shares.

Su emphasizes the trial court's determination that Vantage made a prima facie case that it may recover the shares based on Su's breach of fiduciary duties. As we construe Su's appellate contention, he challenges the trial court's reasoning because (1) F3 Capital acquired the majority of the shares before Su became a fiduciary, and (2) Vantage may not recover the shares acquired after Su became a fiduciary, even under a breach-of-fiduciary-duty theory. We will discuss separately the shares acquired before and after Su became a fiduciary because our analysis is somewhat different for each category.

### *Shares acquired before Su became a fiduciary*

We acknowledge F3 Capital did not acquire all of the 72,238,972 shares governed by the temporary injunction through Su's alleged breach of fiduciary duties or while Su was a Vantage fiduciary. Rather, F3 Capital acquired some shares simultaneously with Su becoming a fiduciary; i.e. when the transactions closed, Su became a director of Vantage, and F3 Capital received 33,333,333 Vantage shares and the right to acquire an additional 25 million shares.

18

Nonetheless, we conclude Vantage proved a probable right to recover the 33 million and 25 million shares via equitable remedies.[6]

We recognize the trial court expressly recited that Vantage proved a probable right to recover the shares via "disgorgement" based on Su's breach of fiduciary duties. Disgorgement of profits is an equitable remedy appropriate when a party has breached his fiduciary duty; its purpose is to protect relationships of trust by discouraging disloyalty. *See, e.g.*, *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex. 2010); *Burrow v. Arce*, 997 S.W.2d 229, 238 (Tex. 1999). However, disgorgement is not the only equitable remedy requested by Vantage because it also requests a constructive trust based on fraud. Vantage urges that we may uphold the temporary injunction on that theory.[7]

When reviewing a temporary injunction, we are not limited to the reasons stated by the trial court or its findings of fact and conclusions of law. *Erickson v. Rocco*, 433 S.W.2d 746, 750 (Tex. Civ. App.—Houston [14th Dist.] 1968, writ ref'd n.r.e.). We should review all the evidence and indulge in all legitimate inferences from the evidence in a light most favorable to the temporary injunction, even if we may disapprove of the reasons given by the trial court. *See Hartwell's Office World, Inc. v. Systex Corp.*, 598 S.W.2d 636, 638 (Tex. Civ. App.—Houston

---

[6] F3 Capital did not exercise the right to acquire the 25 million shares until the parties later modified the Drillship Purchase Agreement—after Su became a fiduciary. Su suggests those shares should be treated as acquired before he became a fiduciary, when F3 Capital obtained the right to acquire them. We need not decide at what point F3 Capital may be considered as having acquired those shares because even if that occurred before Su became a fiduciary, Vantage proved a probable right to recover those shares. Thus, solely for purposes of discussion, we will treat those shares as acquired before Su became a fiduciary.

[7] The trial court recited some elements of fraud but did not expressly find all of the elements or use the term "constructive trust." Arguably, the trial court found "constructive trust" may be an appropriate remedy by reciting Vantage proved a probable right to recover the shares through disgorgement or "comparable equitable relief." Regardless of whether the trial court meant for that "comparable equitable relief" to include a constructive trust, we may uphold its conclusion on this element because Vantage presented evidence supporting a constructive trust.

19

[14th Dist.] 1980, writ ref'd n.r.e.); *Erickson*, 433 S.W.2d at 750. "If such a review of the evidence will support any findings of fact that would, in turn, support the trial court's judgment, those findings are implied in the judgment, itself." *Erickson*, 433 S.W.2d at 750; *see Waddell v. Lee*, 562 S.W.2d 32, 33 (Tex. Civ. App.—Houston [14th Dist.] 1978, no writ) (quoting *Erickson*). Because a trial court cannot abuse its discretion in reaching a correct result for the wrong reasons, we will uphold a trial court's order reviewed under the abuse-of-discretion standard on any ground supported by the record. *See In re ExxonMobil Corp.,* 97 S.W.3d 353, 358 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding); *Luxenberg v. Marshall,* 835 S.W.2d 136, 141–42 (Tex. App.—Dallas 1992, orig. proceeding).

A constructive trust is an equitable remedy created by the courts to prevent unjust enrichment. *Hubbard v. Shankle*, 138 S.W.3d 474, 485 (Tex. App.—Fort Worth 2004, pet. denied).

> It is a well settled general rule that if one person obtains the legal title to property, not only by fraud, or by violation of confidence of fiduciary relations, but in any other unconscientious manner, so that he cannot equitably retain the property which really belongs to another, equity carries out its theory of a double ownership, equitable and legal, by impressing a constructive trust upon the property in favor of the one who is in good conscience entitled to it, and who is considered in equity as the beneficial owner.

*Binford v. Snyder*, 189 S.W.2d 471, 472–73 (Tex. 1945); *see Meadows v. Bierschwale*, 516 S.W.2d 125, 128 (Tex. 1974). A constructive trust subjects the person holding title to property to an equitable duty to convey it to another on the ground the person's acquisition or retention of the property is wrongful and he would be unjustly enriched if permitted to retain it. *Baker Botts, L.L.P. v. Cailloux*, 224 S.W.3d 723, 736 (Tex. App.—San Antonio 2007, pet. denied) (citing *Talley v. Howsley*, 176 S.W.2d 158, 160 (Tex. 1943)); *Miller v. Huebner*, 474

20

S.W.2d 587, 590–91 (Tex. Civ. App.—Houston [14th Dist.] 1971, writ ref'd n.r.e.).

To establish that a constructive trust exists, the proponent must prove (1) breach of a special trust, fiduciary relationship, **or** actual fraud, (2) unjust enrichment of the wrongdoer, and (3) tracing to an identifiable res. *Hubbard*, 138 S.W.3d at 485. "A constructive trust is justified when one party commits fraud **or** . . . breaches a fiduciary relationship." *Baker Botts*, 224 S.W.3d at 736 (emphasis added) (citing *Meadows*, 516 S.W.2d at 128; *In re Marriage of Nolder*, 48 S.W.3d 432, 434 (Tex. App.—Texarkana 2001, pet. denied)). Therefore, imposition of a constructive trust may be based on fraud and does not require a breach of fiduciary duty. See *Baker Botts*, 224 S.W.3d at 736; *Hubbard*, 138 S.W.3d at 485; *Nolder*, 48 S.W.3d at 434; *see also Burkhart Grob Luft und Raumfahrt GmbH & Co. KG v. E–Sys., Inc.*, 257 F.3d 461, 469 (5th Cir. 2001) (quoting *Meadows*, 516 S.W.2d at 128, when stating, "Under Texas law, a constructive trust is an equitable remedy available to a party that has been defrauded.").

The elements of fraud are (1) the speaker made a material representation, (2) it was false, (3) the speaker knew the representation was false when made or made it recklessly without any knowledge of its truth and as a positive assertion, (4) the speaker made the representation with intent that the other party act upon it, (5) the other party acted in reliance on the misrepresentation, and (6) that party suffered injury thereby. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011). For fraudulent inducement, the elements of fraud must be established as they relate to an inducement to enter into a contract between the parties. *See Haase v. Glazner*, 62 S.W.3d 795, 798–99 (Tex. 2001).

The following evidence and reasonable inferences supported the fraudulent-inducement claim relative to the shares acquired before Su was a fiduciary: (1) Su

misrepresented that the payment schedule from Vantage to Su's affiliate for the *Platinum Explorer* would correspond with the payment schedule on the Daewoo contract; (2) Su knew these representations were false because it was his affiliate who had contracted with Daewoo; (3) Su intended Vantage to act on the misrepresentations because the transactions with Vantage were extremely lucrative to Su; and (4) the misrepresentations were material to, and relied on by, Vantage when deciding to enter into the transactions because the aspect of the corresponding payment schedules was vital to its ability to obtain financing.

Likewise, Vantage presented evidence on the elements necessary to impose a constructive trust: (1) the above-described fraud; (2) resulting unjust enrichment of Su via the transfer of Vantage shares to Su's wholly-owned subsidiary, F3 Capital, upon closing of the transactions; and (3) tracing to an identifiable res— those shares. *See Hubbard*, 138 S.W.3d at 485. Accordingly, Vantage established a probable right to recover the shares transferred upon closing of the transactions.

### Shares acquired after Su became a fiduciary

With respect to the shares acquired after Su became a fiduciary, he suggests (1) he did not breach fiduciary duties in the manner outlined by the trial court, or (2) disgorgement is inappropriate because any breach did not amount to fraudulent inducement.

To support his first contention, Su focuses on the trial court's finding that Vantage made a prima facie case that Su breached fiduciary duties by failing to comply "with his obligations under the Transactions." Su suggests such actions could not constitute a breach of fiduciary duties because he was a party only to the Memorandum of Understanding, which was non-binding. However, it is undisputed the parties to the binding contracts were Su affiliates. It is a reasonable conclusion that Su breached his fiduciary duties to Vantage if he caused his

22

affiliates to breach their contracts with Vantage, including the obligation to cooperate in Vantage's financing efforts for purchase of the *Platinum Explorer*. Moreover, apart from the breach-of-contract finding, the trial court generally found Vantage made a prima facie case that Su "breached his fiduciary duty, frustrating Vantage's ability to obtain financing for existing transactions that were essential to the viability of the company." Su does not contest that, regardless of any contractual obligations of his affiliates, Su was bound as a fiduciary to refrain from taking affirmative actions that would harm Vantage's financing efforts.

Vantage presented evidence that Su not only failed to cooperate but took affirmative actions to harm the financing efforts, while intending to benefit himself: (1) Su demanded (albeit unsuccessfully) early remittance of some or all of Vantage's down payment on the *Platinum Explorer*, although that arrangement would be viewed negatively by potential financers; (2) Su perpetuated his pre-closing misrepresentations that Vantage's payment schedule for the *Platinum Explorer* corresponded with the payment schedule to Daewoo—despite knowing that aspect was vital to Vantage obtaining financing; (3) Su conditioned his willingness to provide the complete Daewoo contract on Vantage modifying the option for the *Titanium Explorer* to a joint venture whereby Su would own 50%; and (4) Su failed to provide a complete Daewoo contract until the eve of the financing roadshow—when it was too late for Vantage to adjust its financing efforts to compensate for the now-revealed discrepancy in payment schedules.

Next, citing *ERI Consulting Engineers*, 318 S.W.3d at 881–82, Su apparently maintains that Vantage cannot obtain disgorgement of the shares because any breach of fiduciary duties did not amount to fraudulent inducement. We do not necessarily agree with Su's interpretation of that case. Nonetheless, we need not consider its scope because Vantage presented evidence that Su's breach

23

of fiduciary duties, as outlined above, did amount to fraudulent inducement. In fact, although the trial court did not use the term "fraud," it found, and the evidence supports, that (1) Su's actions in frustrating the financing efforts were designed to obtain additional cash and other benefits, and (2) this breach benefited Su directly and is traceable to the shares at issue. Thus, Vantage presented evidence of a right to recover those shares by disgorgement (due to breach of fiduciary duties amounting to fraud) or a constructive trust (based on fraud alone).

Specifically, again, Su's continued misrepresentations about the corresponding payment schedules were material to Vantage and it relied on them by proceeding with efforts to obtain financing and consummate the transaction. Then, revelation of the actual payment structure for the Daewoo contract on the eve of the scheduled roadshow "killed" the financing efforts. Because acquisition of the *Platinum Explorer* was integral to Vantage's continued viability, it was forced to re-trade the deal and reach the new agreement whereby F3 Capital received further Vantage shares and other benefits.

Further, it is a rational inference that Su perpetuated the misrepresentations regarding the Daewoo contract in order to force the new agreement because it resulted in further lucrative benefits paid to Su. Other adverse actions by Su after he became a fiduciary support this inference: (1) his repeatedly demanding premature remittance of the down payment on the *Platinum Explorer* and threatening to withhold Vantage's right to control specifications if it failed to comply; and (2) his forcing Vantage to redirect millions earmarked for the purchase of the jack-up rigs to meet Su's initial payment on the Daewoo contract— when Su had obtained a deferral and thus retained those funds interest-free for a period. We recognize these actions would result in Su receiving benefits other than the shares governed by the temporary injunction. But, these actions support

24

Vantage's position that Su engaged in a pattern of taking actions detrimental to Vantage in order to extract more benefits. Thus, these actions are relevant to show Su's intent with respect to the misrepresentations that did result in his receiving more shares. Accordingly, Vantage demonstrated a probable right to recover the shares received by Su while he was a fiduciary.

## 2. Whether Vantage may recover shares held by F3 Capital

Su further maintains that, irrespective of his own actions, Vantage did not prove a probable right to recover the shares from F3 Capital because it was never a Vantage fiduciary. The trial court found that, if Vantage obtains judgment against Su, it may be entitled to recover the shares via equitable relief in this action or in a subsequent enforcement action against F3 Capital or other transferees of the shares. We agree with the trial court's conclusion.

Vantage cites authority recognizing that when property subject to a constructive trust is transferred, the recipient of the property takes title to the property subject to the trust if (1) the recipient does not give consideration for the property, or (2) the recipient has notice of the existence of the trust at the time of the transfer. *Cote v. Texcan Ventures II*, 271 S.W.3d 450, 453 (Tex. App.—Dallas 2008, no pet.) (citing *Binford*, 189 S.W.2d at 473). A court of equity can impose a constructive trust on property "in the hands of the original wrongdoer or . . . any subsequent holder, until a purchaser of it in good faith and without notice acquires a higher right, and takes the property relieved from the trust." *Fitz–Gerald v. Hull*, 237 S.W.2d 256, 263 (Tex. 1951); *see Teve Holdings Ltd. v. Jackson*, 763 S.W.2d 905, 908 (Tex. App.—Houston [1st Dist.] 1988, no writ).

Vantage's evidence indicates F3 Capital was aware of the alleged fraud and breach of fiduciary duties resulting in its acquisition of the shares considering that Su is F3 Capital's sole owner, director, and officer. F3 Capital cannot claim the

25

status of an unsuspecting, innocent transferee of property subject to a constructive trust. And, as the trial court found, Su has not shown Vantage would be foreclosed from recovering shares held by F3 Capital in constructive trust by adding F3 Capital to this suit or bringing a subsequent enforcement action against it.

Further, as Vantage argues, an order for a constructive trust over, or disgorgement of, the shares held by F3 Capital would work "hand-in-glove" with the Texas Turnover Statute. Under that statute, to aid in enforcement of a judgment, a court may "order the judgment debtor to turn over nonexempt property that is in the debtor's possession or is subject to the debtor's control . . . ." Tex. Civ. Prac. & Rem. Code Ann. § 31.002(b)(1) (West, Westlaw through 2015 R.S.). Again, the shares are subject to Su's control because he is F3 Capital's sole owner, director, and officer, and has consistently treated the shares as subject to his control.[8]

In summary, because Vantage proved a probable right to recover the Vantage shares held by F3 Capital, we overrule Su's second issue.

## C.  Whether Vantage proved a probable, imminent, and irreparable injury in the interim

According to the following findings, the trial court determined that Vantage satisfied this element because Su had encumbered Vantage shares held by F3 Capital by pledging them to creditors of other Su-controlled entities:

13.   Mr. Su acting through F3 Capital, has caused F3 Capital to encumber approximately 55 million of the Shares as security for third-party creditors of other entities under Mr. Su's common ownership and control.

_____

[8] Vantage also posits it may recover the shares from F3 Capital under alter ego and privity theories. Because we agree Vantage made a prima facie case for recovery of the shares under some theories, we need not address the viability of every theory proffered by Vantage.

14. Mr. Su, acting through F3 Capital, personally pledged 12.1 million Shares to the Royal Bank of Scotland, 9 million Shares to Sinopec, and 3 million Shares to NewLead Holdings.

15. Mr. Su's actions taken individually, or by or through F3 Capital, threaten to dispose of the Shares that are the subject of this pending litigation.

16. Allowing Mr. Su to dispose of these Shares would infringe upon Vantage's equitable interest in the Shares.

17. To allow Mr. Su to dispose of these Shares would permit him to interfere with this Court's exercise of its jurisdiction over the subject matter of this suit by rendering any judgment regarding the Shares at issue ineffectual.

18. Unless Mr. Su and all persons acting in concert with or under Mr. Su's control are restrained from further efforts to sell, transfer, pledge or otherwise encumber or dissipate the shares, Vantage's ability to obtain meaningful relief in this action or any later enforcement action will be rendered moot.

On appeal, Su does not challenge the above-cited findings regarding his encumbering shares for the benefit of his other affiliates. Nevertheless, it is undisputed that, in a bankruptcy proceeding, Su pledged to creditors millions of the Vantage shares held by F3 Capital. *See In the Matter of TMT Procurement Corp.*, 764 F.3d 512, 515–19 (5th Cir. 2014); *see also In re TMT Procurement Corp.*, No. 13-33763, 2014 WL 1577475 (Bankr. S.D. Tex. Apr. 16, 2014), vacated and remanded, *TMT Procurement Corp.*, 764 F.3d 512. The bankruptcy proceeding was filed on behalf of more than twenty companies controlled by Su, which are not parties to the present suit. *See TMT Procurement*, 764 F.3d at 516. Certain creditors moved to dismiss the proceeding. *See id.* With respect to most of the debtors, in lieu of dismissal, the bankruptcy court permitted Su (over Vantage's objection) to deposit millions of the Vantage shares held by F3 Capital as collateral for the creditors. *See id.* at 515–19; *TMT Procurement*, 2014 WL 1577475, at *1–6. When the trial court issued the temporary injunction in the present case, the

orders of the bankruptcy court were still in place. Subsequently, the Fifth Circuit vacated the orders, holding the bankruptcy court could not order such use of the Vantage shares in the bankruptcy proceeding. *See TMT Procurement*, 764 F.3d at 519–28. However, Su at least attempted to encumber (and successfully so, before the Fifth Circuit decision) the Vantage shares in that proceeding.

Moreover, at the temporary-injunction hearing, Su acknowledged he previously pledged (outside the above-mentioned bankruptcy proceeding) Vantage shares held by F3 Capital for other obligations of his affiliates—including pledges to the Royal Bank of Scotland, Sinopec, and NewLead Holdings, the entities mentioned by the trial court in its findings.

In summary, Vantage presented evidence it would suffer a probable, imminent, and irreparable injury before trial if a temporary injunction did not issue because of Su's previous actions in placing, or attempting to place, the shares out Vantage's reach. We overrule Su's third issue.

## D. Collateral-estoppel contention

In his final attack on the merits of the injunction, Su asserts such relief was barred by collateral estoppel. That doctrine prevents a party from re-litigating an issue that it previously litigated and lost. *Calabrian Corp. v. Alliance Specialty Chems., Inc.*, 418 S.W.3d 154, 158 (Tex. App.—Houston [14th Dist.] 2013, no pet.). The party relying on the doctrine must establish (1) the facts sought to be litigated in the second action were fully and fairly litigated in the first action, (2) the facts were essential to the judgment in the first action, and (3) the parties were cast as adversaries in the first action. *See id.*

Su suggests the doctrine applies here because the bankruptcy court ruled Vantage is not entitled to a constructive trust over the shares, when rejecting its

28

challenge to Su depositing the shares as collateral in that proceeding. However, we conclude that at least the first element of collateral estoppel is not satisfied in this case. Whether Vantage is entitled to a constructive trust over the shares was not "fully . . . litigated" in the bankruptcy court because there was not a final determination that Vantage has no such right. *See id.* As noted above, the Fifth Circuit vacated the bankruptcy court's orders. *See TMT Procurement Corp.*, 764 F.3d at 528. We recognize the Fifth Circuit had not issued its opinion when the trial court signed the temporary injunction. *See id.* But, Vantage had filed an appeal of the bankruptcy court's ruling, and the Fifth Circuit had heard oral arguments. Thus, the issue had not been finally litigated, and collateral estoppel did not bar the temporary injunction. We overrule Su's fourth issue.

## IV. AMOUNT OF THE BOND

Finally, we address Su's fifth issue and the corresponding portion of his appellate motion challenging the amount of the temporary-injunction bond. Before granting a temporary injunction, the trial court must require the applicant to post a bond in the sum fixed by the trial court payable to the adverse party. Tex. R. Civ. P. 684. The purpose of the bond is to secure payment to the party against whom the injunction is granted in the amount of damages he would suffer if the injunction is subsequently dissolved. *Biodynamics, Inc. v. Guest*, 817 S.W.2d 128, 130 (Tex. App.—Houston [14th Dist.] 1991, writ dism'd by agr.). The trial court has considerable discretion in setting the amount of the bond. *Id.* at 131; *see IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 203 (Tex. App.—Fort Worth 2005, no pet.). We review case-by-case the adequacy of a bond set by the trial court based on the record before us. *IAC, Ltd.*, 160 S.W.3d at 203.

Here, the trial court set the bond at $125,695.81. Su argues that amount is insufficient because it represents a percentage of the value of the shares subject to

the injunction rather than the damages he would sustain as a result of the injunction. In support, Su cites only his following testimony at the hearing:

> Q. If the court were to enjoin F3 from selling its shares of Vantage, how would that affect its business and the business of related companies, if at all?
>
> A. Huge. These shares has values, but actually there is a reason. So the -- another issue, the shares restricted by the Vantage --
>
> Q. Mr. Su, listen to my question. My question is how would it affect your businesses if the Court were to prevent F3 Capital from disposing or using its shares as it sees fit?
>
> A. It will affect my Chapter 11 and it will affect my business to survive.
>
> Q. Can you put a figure on it for us?
>
> A. $1.5 billion.
>
> Q. That's what you stand to lose?
>
> A. Yes, sir.

This testimony is too general and conclusory to establish Su would suffer $1.5 billion in damages from the injunction. Su did not explain how he calculated this amount or the nature of such potential loss. Therefore, on this record, the trial court did not abuse its discretion by setting the bond at $125,695.81. *See id.* (holding trial court did not abuse its discretion in setting amount of bond where nothing in record demonstrated defendants' potential lost profits from temporary injunction precluding their use of applicant's trade secrets; testimony that "income [defendants] expected to derive" from selling products made from the information "would be lost" was insufficient); *Biodynamics, Inc.*, 817 S.W.2d at 131 (rejecting defendant's challenge to temporary-injunction bond where there was nothing in the record to show amount was insufficient). Accordingly, we overrule Su's fifth issue and the portion of his appellate motion challenging the amount of the bond.

Having overruled all of Su's issues in his appellate motion and brief, we deny the motion and affirm the temporary injunction.


/s/    John Donovan
       Justice


Panel consists of Justices Boyce, Jamison, and Donovan.