In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-21-00072-CV

**EDWARD VAN HUIS IV, Appellant**

**V.**

**MARINE VENTURES, LTD, Appellee**

_____

**On Appeal from the 60th District Court
Jefferson County, Texas
Trial Cause No. B-207,016**

_____

**MEMORANDUM OPINION**

Edward Van Huis IV filed an interlocutory appeal of a temporary injunction that favors the party that sought the injunction, Marine Ventures, Ltd.[1] *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4) (permitting interlocutory appeal of temporary injunction). In three issues, Van Huis challenges the scope of the

---

[1] "A temporary injunction's purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002) (citations omitted).

1

injunction, which temporarily enjoined him from distributing the proceeds related to the sale of other family-owned companies. He also argues the evidence is insufficient to support the trial court's order granting the temporary injunction. Finally, Van Huis complains the bond the trial court set is inadequate to protect him against the damages he argues the trial court's order has caused. For the reasons explained below, we affirm.

## I. Background

In January 2021, Marine Ventures filed an Original Petition and Application for Temporary Restraining Order and Hearing on Temporary Injunction against Tubal-Cain Marine Services, Inc., Tubal-Cain Holdings, LLC, Edward J. Van Huis III, Deborah Van Huis, Edward Van Huis IV, Jonathan Van Huis, and Timothy Van Huis in their individual capacities.[2] In February 2007, Tubal-Cain Marine Services entered into a ten-year commercial lease agreement with Marine Ventures to operate a dry dock/shipyard to repair and construct seafaring vessels. However, Marine Ventures alleged that contrary to the express terms of the lease excluding such activities, Tubal-Cain Marine Services engaged in barge fleeting and barge cleaning activities. Tubal-Cain Marine Services abandoned the property in late 2016, before

---

[2] Defendants Tubal-Cain Marine Services, Inc., Tubal-Cain Holdings, LLC, Edward J. Van Huis III, Deborah Van Huis, Jonathan Van Huis, and Timothy Van Huis entered into an Agreed Order on Plaintiff's Application for Temporary Injunction and are not a part of this appeal.

the conclusion of its lease with Marine Ventures. According to Marine Ventures, while conducting its operations and on the lease, Tubal-Cain Marine Services caused environmental damages to the property that it had leased from Marine Ventures. Marine Ventures further alleged that Tubal-Cain was responsible for failing to properly clean and remove the hazardous materials in accord with the terms of its lease and environmental laws and regulations, subjecting Marine Ventures to damages and cleanup costs through a program administered through the Texas Commission on Environmental Quality (TCEQ). And Marine Ventures claimed that Tubal-Cain not only failed to remedy the environmental hazard related to its release of waste materials on the property it leased from Marine Ventures, it also refused to indemnify, defend, and hold Marine Venture harmless from the damages it caused Marine Ventures to incur based on Tubal-Cain's misuse of the Leased Property. Marine Ventures asserted claims for breach of contract and for environmental damages.

After its lease expired the TCEQ notified Tubal-Cain in July 2017 that Tubal-Cain had to remove all waste from the waste management unit it created on the Leased Property and demonstrate to the TCEQ that a release had not occurred from the unit. TCEQ notified Tubal-Cain that the obligation Tubal-Cain had incurred was one that continued to "ensure that municipal hazardous waste and industrial solid waste are managed in a manner which does not cause the discharge or imminent

3

threat of discharge of waste into or adjacent to waters in the state[.]" In July 2018, TCEQ informed Tubal-Cain that testing showed the soil and groundwater were contaminated and additional action was necessary to remove the hazardous material and remediate the property. TCEQ also notified Tubal-Cain that its failure to comply would constitute a violation of the United States Environmental Protection Agency Consent Agreement, an agreement issued after the EPA visited the Leased Property in October 2014 and fined Tubal-Cain after conducting an investigation into the waste management practices that relate to its use of the Leased Property.

In 2019, Tubal-Cain Marine Services, Inc. sold "all and/or virtually all" of Tubal-Cain Marine Services' assets to VLS Recovery Services, LLC through an asset purchase agreement. All payments from VLS for the purchase of Tubal Cain-Marine Services, Inc. were paid to the "the parent and sole shareholder" of Tubal-Cain Marine Services, Inc., Tubal-Cain Holdings, LLC. Other than the payment of certain disclosed debts, Tubal-Cain Marine Services, Inc. did not receive any funds from the sale of "all and/or virtually all" of its assets to VLS Recovery Services, LLC. Marine Ventures alleges that this resulted in a "asset-free shell corporation from which [creditors were forced] to collect." The purchase agreement placed a certain amount of the purchase price into an escrow account and a portion of the escrow money was distributed to Tubal-Cain Holdings in July 2020. Tubal-Cain Holdings, LLC immediately distributed funds it received from the sale of the assets

4

of Tubal-Cain Marine Services to its five members. Van Huis owns more than 43% interest in Tubal-Cain Holdings. According to Marine Ventures, the remaining amount is "the only known money and/or asset available to Tubal-Cain Marine Services, Inc. from the sale of its assets to VLS Recovery Services, LLC to satisfy the claims of its creditors, including the Plaintiff."

In the underlying lawsuit, Marine Ventures further pleaded violations of the Texas Uniform Fraudulent Transfer Act (TUFTA) and Texas Business Organizations Code under sections 21.301 and civil conspiracy. Marine Ventures asked the trial court to issue a temporary injunction enjoining the defendants from "transferring, dissipating, or otherwise disposing of any proceeds received from the sale of Tubal-Cain [Marine Services] until Plaintiff receives payment for the damages it incurred as a result of…breaches of the Commercial Lease Contract with Plaintiff." In response, Van Huis filed an answer and special exceptions to Marine Venture's application. A hearing on Marine Ventures' application for temporary injunction was held in March 2021.

## A. Testimony of Edward Van Huis IV

Van Huis testified that he was the president of Tubal-Cain Marine Services, Inc. Beginning in February 2007, Tubal-Cain Marine Services leased a 9-acre lot on the Sabine-Neches Canal in Jefferson County for a "a shipyard and/or dry dock facility to repair and construct seafaring vessels." Van Huis explained that in his

5

position as president of Tubal-Cain Marine Services, he was the "top person" in charge, but that he had managers in place to cover different areas of the business and ultimately, he had authority over his managers. Tubal-Cain Marine Services abandoned the property in late 2016, which was before its lease with Marine Ventures expired.

Van Huis also testified that he was the president of Tubal-Cain Holdings, LLC, which was formed in 2012 or 2013. In July 2019, VLS bought Tubal-Cain Marine Services, Inc. and "Five QSubs" for 48 million dollars. As part of the asset purchase agreement, VLS agreed to place 10% of the purchase price into an escrow account. The escrow account was created to hold money and charge off expenses that were incurred by Tubal-Cain. According to Van Huis, the liabilities included any potential liabilities that he disclosed to VLS before Tubal- Cain Marine, in 2019, sold virtually all its assets to VLS in the asset purchase agreement. The amount escrowed resulted in approximately $4.5 million, which was distributed in two escrowed accounts. In July 2020, $3.8 million of the amount in escrow was released to Tubal-Cain Holdings. The remaining balance, still in escrow, was scheduled to be released in July 2021. Van Huis explained that before any money from VLS was paid to Tubal-Cain Holdings, debts of $30 million had to be paid. After VLS paid the $30 million of debt, there was approximately $18 million remaining from the sale of the assets. Van Huis confirmed VLS purchased all the assets of Tubal-Cain

Marine Services, Inc., but Tubal-Cain Marine Services did not receive any money from the sale. Instead, the funds VLS used to purchase all the Tubal-Cain family-owned businesses were paid directly to various creditors and to Tubal-Cain Holdings.[3] Van Huis received 43.57% of the 18 million dollars, as "my ownership percentage."[4] This percentage was "[a]pproximately $8 million." Van Huis confirmed that after "expenditures and taxes," at the time of the temporary injunction hearing, he still had about $4 million from the sale proceeds. According to Van Huis, when Tubal-Cain Marine Services was sold to VLS, he acted in his "corporate company capacity[.]" He testified that he acted in good faith in this capacity and disclosed everything he knew during the sale of the corporate assets.

Van Huis explained that in the negotiations that resulted in purchase of Tubal-Cain assets by VLS, he disclosed "several" liabilities of Tubal-Cain to VLS, but he did not include Marine Ventures in that disclosure because "it was not an issue at that time." For that reason, issues involving Tubal-Cain Marine Services environmental liabilities were not disclosed. According to Van Huis, details regarding inquiries from the TCEQ about Tubal-Cain were not disclosed because he

_____

[3] In his Reply Brief, Van Huis represented that he testified that money from the sale of the multiple companies' assets, including but not limited to the assets of Tubal-Cain Marine Services, Inc., paid off the debt at the family property known as Old Yacht Club Properties.

[4] Testimony demonstrated that the five people, including Van Huis, who received interests in the proceeds from the purchase of Tubal-Cain Marine Services, Inc., were the five people who were members of Tubal-Cain Holdings, LLC.

"did not receive any." Van Huis testified that he has environmental managers who take care of TCEQ inquiries, noting that the two employees who were responsible for fielding inquiries from the TCEQ both now work for VLS. Van Huis explained that currently, his father is assigned the responsibility on behalf of Tubal-Cain Holdings to handle any claims for damages to the property leased from Marine Ventures and pollution allegations with the TCEQ. Van Huis testified that when Tubal-Cain Marine Services vacated Marine Venture's property in 2016, he was not aware of any pollution issues. He further explained that he was not aware of Marine Venture's allegation regarding pollution until he was served with a lawsuit in 2021.

**B. Testimony of Bryan Clevenger**

Bryan Clevenger testified that he is employed by EnSafe and is an environmental scientist and project manager for corrective-action-project sites. Photos of the Leased Premises were presented, one taken in 2006, which was before Tubal-Cain Marine Services leased the property, and one taken after Tubal-Cain Marine Services leased the property in 2012. Clevenger explained that the first photo shows "a large acreage of grass-covered and vegetated property." The second photo, taken in 2012, demonstrates "large areas of dark staining, which is waste blast media or spent blast media[.]" Clevenger stated that this dark staining appeared by Tubal-Cain Marine Services' "Waste Management Unit No. 1." He explained the significance of the waste management units created by Tubal-Cain Marine Services.

When you register as a generator of industrial and hazardous waste in the State of Texas, you are required to register them in various waste management units, which is the area in which that waste is handled. Tubal-Cain Marine Services registered four waste management units during the time in which they were operating. Waste Management Unit No. 1 specifically was where they managed their waste blast media from sandblasting barges and marine vessels.

…

Waste Management Unit No. 2 was a drum storage area. It was near the northeast corner of where this metal building was. Waste Management Unit No. 3 was a building that they stored paint-related waste in. Waste Management Unit No. 4 was on a portion of the property over here (indicating). That was a berm drum storage area. All of these waste management units were within the larger footprint of Waste Management Unit No. 1.

In 2016, Clevenger was hired to do a site walk while Tubal-Cain Marine Services was still on the property. He stated that during this walkthrough, he observed Tubal-Cain Marine Services operations, which included areas where they were sandblasting barges, areas in which they had drums, paint, paint-related waste, and a general overview of their property and operations. He stated that in April 2017, Tubal-Cain Marine Services sent the TCEQ a "waste management unit closer report[.]" He explained that this letter told the TCEQ that Tubal-Cain Marine Services had removed waste at the site and was requesting closure for that waste management unit. The TCEQ responded with a letter in July 2017, asking Tubal-Cain Marine Services to "remove all waste from the waste management unit and demonstrate that a release from the waste management unit to the environment had

9

not occurred." Tubal-Cain Marine Services replied and reiterated that all their waste had been removed and, based on their additional testing, waste and contaminant levels were not an issue. Clevenger explained that although Tubal-Cain Marine Services indicated that it had removed all waste blast media from Waste Management Unit No. 1, the TCEQ responded that it appeared there were two large piles that could be interpreted as spent blast media located near the unit. The TCEQ stated that Tubal-Cain Marine Services did not provide sufficient information to support closing the unit. The letters and subsequent responses from Tubal-Cain Marine Services were admitted at the hearing. According to Clevenger, in response to correspondence from TCEQ, Tubal-Cain Marine Services conducted soil and groundwater sampling and the results showed levels impacted with metals above "Tier 1 residential protective concentration levels." Clevenger summarized the TCEQ's response as follows,

> So, this letter, what that's saying is that this site, based on the data that was provided to the State and based on the analytical data, is impacted with contamination above the TCEQ's protective concentration levels, which are the regulatory levels that require action. This -- in addition to their 2017 letter saying that there was still waste from their waste management units, this said -- this has confirmed that there was an environmental release to the property from their waste management units.

Clevenger testified further about subsequent letters TCEQ sent to Tubal-Cain Marine Services stating Tubal-Cain Marine was noncompliant with requirements, imposed by statute, that related to closing its waste management units. Clevenger

10

pointed to a report prepared by the EPA, which was admitted without objection. In 2014, the EPA visited Tubal-Cain Marine Services and inspected the Leased Property. During the visit, the EPA met with Randy Cooper and Tubal-Cain Marine Services facilities consultant, Ron Reeves. Clevenger explained that as early 2014, the EPA noted that Tubal-Cain Marine Services was using "Black Beauty sandblast materials used as blast media" and subsequently "disposing" of this blast media as "'fill' when it is spent." Clevenger explained the significance of this procedure utilized by Tubal-Cain Marine Services.

> [T]his EPA site investigation was done in 2014. My understanding is that in 2017 the EPA issued fines in a document called the "Consent Agreement and Final Order" to Tubal-Cain Marine Services for compliance violations. The purpose of that EPA inspection was not necessarily to tell them at the time to clean up any of their waste or do anything like that, but it is very important to document in here that as early as 2014 an EPA inspector notes that they were disposing it by disposing of spent blast -- Black Beauty sandblast materials used as blast media by placing it on the property as "fill" when it is spent.
>
> …
>
> It means that you're filling either low-lying areas or you're putting it on the property and using it to level out areas. It's fill material. They're using an industrial waste, a solid waste, as a fill. And you can call it "burying" it as well.

Clevenger then explained that aerial photographs taken in March 2016, after the EPA visit, showed barges being pulled onto land, sandblasted, and sandblast materials disposed of in a fill on the land. He stated the photograph demonstrated more dark areas on the property consisting of disposed blast media. Another

11

photograph showed "bulldozer scars" on the property "as though it had been grated out or covered." Clevenger then provided pictures from 2019, two years after Tubal-Cain Marine Services vacated the property. He testified that the photos showed the presence of waste blast media left by Tubal-Cain Marine Services. He stated that Marine Ventures investigated this property as required by the TCEQ at their own cost. Marine Ventures did this because Tubal-Cain Marine Services did not complete the necessary "Affected Property Assessment." Clevenger stated the following about the removal he believed needed to be performed on the property:

> So, this cost estimate is based on volumes of waste that were determined and documented by this site investigation that was completed. Our estimate is that there are 52,856 tons of waste blast media and contaminated soil at this property. Based on the extent and footprint of the impacts from Waste Management Unit No. 1 and Waste Management Unit No. 2, 52,856 tons. Now, it's important to note that every single inch of this property has not been investigated, and the EPA has pointed out that this -- that some of this material was disposed as fill and maybe buried or -- excuse me. Some of this material may be buried; it may be distributed across the property. Our site investigations found -- were consistent with that. When we would sample soil and install soil boring, we could see blast media extending down in some cases between 2 and a half and 7 and a half feet to below the ground surface.

> So, based on the data that we have now, we have 52,856 tons that we're estimating of waste that would require remediation. There may be areas that we have not identified and that would be identified during said remediation. So, these costs -- this blue outline here (indicating) is for the soil. It says: Removal of 52,856 tons. It includes mobilization, excavation, stockpiling, loading, transport, disposal, and backfill of those areas. It also includes oversight costs, project management costs, work plans to complete the work. It includes laboratory analysis to characterize the waste for disposal of the landfill. It includes the

confirmation sampling necessary to demonstrate to the TCEQ that the waste has been removed. And that cost, based on the data that we have now, would be $8,670,466. This item here allows a 15 percent contingency for additional areas. Again, we have not examined every square inch of this property; and we've identified areas where waste is buried. It's reasonable and it's expected that we're going to identify more areas. So, there's a contingency of 15 percent, which brings us to $9,971,036. That is for the soil alone. And the soil has been more extensively studied than anything else on this property, just given the nature of the release, with it being the blast media that's distributed about across the -- that was disposed across the soil in direct contact with the ground surface.

The green down below, if you'll recall the photograph that showed waste blast media in direct contact with the waterway -- part of our investigation involved collecting samples from the waterway about 10 foot off the shoreline, and what we pulled back was waste blast media that had run off from Tubal-Cain's operations or had been directly disposed from Tubal-Cain's operations. It's unclear whether it was runoff or direct discharge. Regardless, the source of these impacts was from Waste Management Unit No. 1. That blast media was consistent analytically with what was found on-site as well. We're estimating a certain area out into this waterway.

It's important to note here that the extent of the impacts in the waterway from Tubal-Cain Marine Services is not defined. If you go back to the TCEQ's letter, their Screening-Level Ecological Risk Assessment has not been completed. Their APAR was not approved; their Affected Property Assessment Report was not approved by TCEQ. There has been no ecological reporting by Tubal-Cain Marine Services, and there's no definition on how far out their waste media has extended into the waterway. So, we're defining costs here for this item based on the data that we know alone -- it may extend further than the data that we know, if that – if that all makes sense to everyone. So, we've added a contingency here.

Based on the data that we have now -- again, this is not -- this is not a hypothetical; this is based on our findings so far -- it is 563,291. If this -- if the locations we sample, if we continue to find that media out for an area that's twice as large or more, that cost would go up. We've

added a contingency here with a note that we -- effectively would cover two times the area with contingency on those costs or for impacts to the waterway. The total between those two, based on the data that we have, the site investigation that's been done, is $9,233,757. The total with that contingency built in for what we would -- what we may expect to find once we begin remediation or once Tubal-Cain completes their required assessment, is $11,097,618.

Clevenger continued that Tubal-Cain Marine Services failed to submit ecological studies to TCEQ, explaining that they were required to screen and provide a Screening-Level Ecological Risk Assessment report. If TCEQ requests additional investigation in the waterway by the property, "[i]t can drive regulatory cleanup levels… warrant a lower, more conservative cleanup level[, and] … increase costs." During cross-examination, Clevenger agreed that waste blast contamination could last for decades but clarified that although the property had been used as a shipyard in the decade before Tubal-Cain Marine Services leased the property, "[t]here was no blasting and painting operations -- blasting and painting were not conducted on the land, based on the information that I've seen. Blasting and painting were conducted on the offshore barge."[5] And Clevenger testified no one had registered with the TCEQ to conduct blasting or painting operations on the property before Tubal-Cain Marine Services. To be fair, Clevenger admitted that no one showed him a "baseline evaluation" of the pollution studies for the property that showed its environmental status before Tubal-Cain Marine Services' lease began.

---

[5] Clevenger later clarified this "offshore barge" was a docked barge.

## C. Testimony of Christopher Bean

Christopher Bean testified that he is the vice-president and acting manager of Marine Ventures. He testified that Marine Ventures leased the acreage to Tubal-Cain Marine Services on February 1, 2007. The lease was admitted into evidence and Edward Van Huis III's signature is on the lease. According to Bean, he did not have personal contact with Van Huis after 2008. He stated that Tubal-Cain Marine Services breached the lease by, among other things, creating a nuisance with its waste, performing barge cleaning operations that violated the acceptable standards that applied to those operations, violating environmental laws and the Texas Water Code by dredging and dumping spoil from its operations without having the appropriate and required permits, disposing of spent and blast materials on the premises as fill, and by failing to remove the contaminated material and remediate the site or pay the damages caused by its operations on the lease.

According to Bean, Marine Ventures was required to hire EnSafe to assess the nature and extent of the damages and contamination on the Leased Property. Bean testified that Tubal-Cain Marine Services abandoned the property without notifying Marine Ventures that it had been notified by the government that an environmental or regulatory action would be instituted or had been threatened, failed to notify Marine Ventures that it had created an environmental hazard by its operations, and failed to notify Marine Ventures that it had violated the requirements that applied to

15

its operations under its lease. According to Bean, Marine Ventures has lost rental income of "over a million dollars" since the termination of the lease due to the contamination of the Leased Property, damages that do not include the damages to fixtures, buildings, and environmental damage. Bean explained his assessment of the damages includes three acres not originally included in the Leased Property's acreage but is property Tubal-Cain Marine Services used while it occupied the Leased Property. Bean calculated that Tubal-Cain Marine Services owes "just under $500,000[]" for the property they utilized that lies adjacent to the Leased Property, property they were using but on which they were not paying rent. Bean stated that in the decade before Marine Ventures leased the property to Tubal-Cain Marine Services, the property was used in various ways, including fleeting of barges, and some dry dock activity that included "[r]epair to marine equipment." But any type of blasting or painting was performed on an adjacent property owned by another company.

When the hearing ended, the trial court granted Marine Ventures' application for a temporary injunction, finding that

> Plaintiff has shown a probable injury because the harm is imminent; if the temporary injunction does not issue, the funds payable to Defendants from VLS Recovery will be released and distributed to Defendants or others, and the injury would be irreparable; and the applicant has no other adequate legal remedy.
>
> Therefore, this temporary injunction is granted because Defendant, Edward Van Huis, IV, has committed acts or is committing acts that

16

will deplete his assets and/or money available to satisfy an adverse judgment and render that judgment in the litigation ineffectual and leave Plaintiff with an irreparable injury and without an adequate legal remedy. It is further

ORDERED that this temporary injunction be effective immediately and the bond paid by Plaintiff in the amount of $500 payable to Defendant, Tubal Cain Holdings, LLC, will extend to this temporary injunction.

As part of the Temporary Injunction, the trial court ordered

Defendant, Eddie Van Huis, IV, is ordered not to directly or indirectly use, convey, assign, encumber, or disburse money or other rights, titles, interests, assets or other proceeds that (1) are or were held in any escrow account or part of any escrow agreement, whether or not previously released, and paid directly or indirectly by VLS Recovery, Aurora Capital Partners, and/or their respective affiliates to (or for the benefit of) Defendant, Edward Van Huis, IV, or any of Defendant in connection with VLS Recovery, Aurora Capital Partners, and/or their respective affiliates' acquisition, asset purchase, and/or merger with Tubal-Cain Marine Services, Inc., Tubal-Cain Holdings, LLC and/or its affiliates (the "Asset Purchase") or (2) Defendant Edward Van Huis, IV received in connection with the Asset Purchase. This order expressly covers any funds that are or were part of an escrow account or part of any escrow agreement arising out of the Asset Purchase that are currently held or were held at Third Coast Bank in the name of or for the benefit of Tubal-Cain Marine Services, Inc., Tubal-Cain Holdings, LLC, or their affiliates, and any funds that are still held or retained by VLS Recovery, Aurora Capital Partners and/or their respective affiliates that have not been paid or released to Tubal-Cain Marine Services, Inc. or Tubal-Cain Holdings, LLC or their affiliates.

Van Huis filed this interlocutory appeal.

## II. Standard of Review

We review a trial court's decision to grant a temporary injunction for an abuse of discretion. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). We must

17

not substitute our judgment for the trial court's judgment unless the trial court's judgment was so arbitrary that it exceeded the bounds of reasonable discretion. *See id.* We review the evidence in the light most favorable to the trial court's judgment and draw all legitimate inferences from the evidence in a manner most favorable to the trial court's judgment. *See Cameron Int'l Corp. v. Guillory*, 445 S.W.3d 840, 845 (Tex. App.—Houston [1st Dist.] 2014, no pet.). We will not find an abuse of discretion if the trial court heard conflicting evidence and evidence appears in the record that reasonably supports the trial court's decision. *Dall. Anesthesiology Assocs., P.A. v. Tex. Anesthesia Grp., P.A.*, 190 S.W.3d 891, 896 (Tex. App.—Dallas 2006, no pet.). The trial court abuses its discretion when it misapplies the law to the "established facts, or when the evidence does not reasonably support the conclusion that the applicant has a probable right of recovery." *State v. Sw. Bell Tel. Co.*, 526 S.W.2d 526, 528 (Tex. 1975) (citations omitted). Our review is limited to the validity of the trial court's temporary injunction order, and we will not consider the merits of the underlying case. *See Cameron*, 445 S.W.3d at 845.

### III. Analysis

**A. Issue One**

In his first issue, Van Huis argues that the trial court abused its discretion by issuing a temporary injunction that is overly broad because it temporarily enjoins the dissipation of proceeds and assets that he received from the sale of "multiple family

18

companies." Specifically, he contends the injunction is overbroad because it attaches to assets that he received from the "sale of corporate interests other than Tubal-Cain Marine."

"A temporary injunction is an extraordinary remedy and does not issue as a matter of right." *Butnaru,* 84 S.W.3d at 204 (citation omitted). To be entitled to a temporary injunction, the applicant must plead and prove a cause of action against the defendant, a probable right to the relief sought, and a probable, imminent, and irreparable injury in the interim. *Id*. It is the applicant's burden to produce some evidence that establishes a probable right of recovery. *Cameron*, 445 S.W.3d at 845; *see also In re Tex. Nat. Res. Conservation Comm'n*, 85 S.W.3d 201, 204 (Tex. 2002) (quoting *Camp v. Shannon,* 348 S.W.2d 517, 519 (Tex. 1961)). However, the applicant is not required to prove that it will ultimately prevail at trial, only that it is entitled to preservation of the status quo pending trial on the merits. *Cameron*, 445 S.W.3d at 845.

In this interlocutory appeal of the temporary injunction, Van Huis sets out three very narrow issues for the court to address. Van Huis does not dispute that the trial court was within its discretion to grant temporary injunction based on the first element, that the applicant must plead and prove a cause of action against the defendant, regarding the specific causes of action pleaded by Marine Ventures for breach of contract, fraudulent transfer of assets, civil conspiracy, violation of Texas

19

Business Organizations Code and environmental statutes. *See generally Rocklon, LLC v. Paris*, No. 09-16-00070-CV, 2016 WL 6110911 (Tex. App.—Beaumont Oct. 20, 2016, no pet.) (mem. op.) (examining a temporary injunction, TUFTA cause of actions, and alter ego); *see also Butnaru*, 84 S.W.3d at 204. Van Huis only asserts that the temporary injunction is "overbroad to the extent that it freezes proceeds derived from the sale of corporate entities and assets other than Tubal-Cain." Van Huis does not contend that there was no evidence that the Tubal-Cain Marine Services sale was made with the intent of depriving Marine Ventures of the ability to recover its losses or satisfy its judgment. *See Rocklon*, 2016 WL 6110911, at *3 ("The purpose of TUFTA is to prevent debtors from prejudicing creditors by improperly moving assets beyond the creditors' reach."). Instead, Van Huis argues that Marine Ventures offered no evidence segregating the proceeds of the sale of Tubal-Cain Marine Services, Inc.'s assets from the proceeds of the sale of other entities. Therefore, we assume without deciding that the trial court did not abuse its discretion in determining that Marine Ventures' causes of action are applicable, and Marine Ventures provided sufficient evidence of its causes of action to support the temporary injunction. *See Butnaru*, 84 S.W.3d at 204.

"Although a temporary injunction should be broad enough to safeguard a party's protectable interests pending a trial on the merits, it should not be so broad that it prohibits the restrained party from engaging in lawful activities that are a

20

proper exercise of its rights." *Cooper Valves, LLC v. ValvTechonologies, Inc*, 531 S.W.3d 254, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (citations omitted). "[A] trial court was well within its discretion to weigh the evidence and determine that [the plaintiff] satisfied the requirements for a temporary injunction[,]" including determining that a plaintiff has a claim against the defendant, and "[w]ithout the injunction, [the defendant] would spend the money." *Morrison v. Colbert*, No. 12-18-00206-CV, 2019 WL 968512, at \*4 (Tex. App.—Tyler Feb. 28, 2019, no pet.) (mem. op.) (citations omitted). In this case, Marine Ventures pleaded a cause of action under TUFTA against the Tubal-Cain Holdings, LLC, its subsidiary companies and its members, alleging that the assets of Tubal-Cain Marine Services, Inc. were wrongfully disposed of leaving the corporate entity without assets to respond to any judgment that may be obtained in this lawsuit. *See* Tex. Bus. & Com. Code Ann. §§ 24.001, 24.002, 24.003–24.013. The purpose of TUFTA is to prevent debtors from prejudicing creditors by improperly moving assets beyond the creditors' reach. *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 607 (Tex. App.—Houston [1st Dist.] 2002, no pet.). TUFTA defines a "claim" as "a right to payment or property, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Tex. Bus. & Com. Code Ann. § 24.002(3). Subject to applicable principles of equity and in accordance with the

21

Texas Rules of Civil Procedure, section 24.008 of TUFTA specifically provides that in an action for relief under the Act, a creditor may obtain "an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property[.]" *Id.* § 24.008(a)(3)(A).

Here, testimony established that VLS purchased all assets of Tubal-Cain Marine Services, Inc. and "five QSubs"[6] for 48 million dollars. This money was not paid to Tubal-Cain Marine Services, Inc. but paid directly to its parent company, Tubal-Cain Holdings, LLC and then distributed to the family owners, the Van Huis family, the sole members of the holding company. The trial court heard testimony that sale of the assets left Tubal-Cain Marine Services, Inc. insolvent.

The trial court also heard evidence that Marine Ventures could potentially suffer several million dollars in damages as a result of Tubal-Cain Marine Services environmental damage to the leased premises and surrounding area. The trial court ordered enjoined-

> …money or other rights, titles, interests, assets or other proceeds that (1) are or were held in any escrow account or part of any escrow agreement, whether or not previously released, and paid directly or indirectly by VLS Recovery, Aurora Capital Partners, and/or their respective affiliates to (or for the benefit of) Defendant, Edward Van Huis, IV, or any of Defendant in connection with VLS Recovery, Aurora Capital Partners, and/or their respective affiliates' acquisition, asset purchase, and/or merger with Tubal-Cain Marine Services, Inc., Tubal-Cain Holdings, LLC and/or its affiliates (the "Asset Purchase")

---

[6] Qualified Subchapter Subsidiary-A corporation as described in the Internal Revenue Code, sec. 1361(b)(3)(B). I.R.C. § 1361(b)(3)(B).

or (2) Defendant Edward Van Huis, IV received in connection with the Asset Purchase. This order expressly covers any funds that are or were part of an escrow account or part of any escrow agreement arising out of the Asset Purchase that are currently held or were held at Third Coast Bank in the name of or for the benefit of Tubal-Cain Marine Services, Inc., Tubal-Cain Holdings, LLC, or their affiliates, and any funds that are still held or retained by VLS Recovery, Aurora Capital Partners and/or their respective affiliates that have not been paid or released to Tubal-Cain Marine Services, Inc. or Tubal-Cain Holdings, LLC or their affiliates.

While Van Huis complains that the scope of the injunction enjoins proceeds from the sale of other corporate assets not associated with Tubal-Cain Marine Services, Inc., Van Huis offered no evidence to support his contention. The trial court was only offered evidence that the sales proceeds were commingled as one lump sum and were being transferred and disbursed, allegedly in violation of TUFTA and other statutes. Van Huis presented no evidence of any breakdown of assets of any other entity he contends was a part of the sale to VLS that are allegedly wrongfully enjoined by the scope of the temporary injunction. *See Hartwell v. Lone Star, PCA*, 528 S.W.3d 750, 759 (Tex. App.—Texarkana 2017, pet. dism'd) (In an evidentiary challenge to a temporary injunction, "we view the evidence in the light most favorable to the trial court's order and indulge every reasonable inference in its favor[,]" noting there must be some evidence that reasonably supports the trial court's decision). Having found evidence in the record to reasonably support the trial court's order, we overrule Van Huis's first issue.

23

**B. Issue Two**

In his second issue, Van Huis argues that "[t]he injunction impermissibly extends to sales proceeds in excess of the value of the lease premises." Van Huis argues that the Texas Supreme Court stated in *Gilbert Wheeler*, real property is classified as either temporary or permanent, and that the difference effects the measure of damages. *See Gilbert Wheeler, Inc. v. Enbridge Pipelines (East Texas), L.P.*, 449 S.W.3d 474, 478–79 (Tex. 2014). Van Huis contends under *Gilbert Wheeler* "[i]f the injury is permanent, then the measure of damages is 'the difference between the value of the land immediately before the injury and its value immediately after[,]' [and] [i]f temporary, then the measure of damages is the cost of repair." Van Huis states that this standard applies to both breach of contract cases and tort cases.

> The trial court's injunction contained the following language,
>
> Marine Ventures, Ltd.'s Application for a Temporary Injunction, presented to the Court today. The Court examined the pleadings of the Plaintiff, the evidence presented, and the argument of counsel, and after due consideration finds that:
>
> 1) a cause of action against the Defendant, Edward Van Huis, IV, exists;
> 2) Plaintiff has a probable right to the relief sought; and
> 3) Plaintiff will suffer a probable, imminent, and irreparable injury in the interim.
>
> Therefore, Plaintiff is entitled to a temporary injunction.
>
> It is therefore ORDERED that the clerk of this Court issue an Order of

24

Temporary Injunction restraining Defendant, Edward Van Huis, IV, and any other person(s) with knowledge of this Order, from engaging in any conduct which delays, hinders or prevents payment from Defendant, Edward Van Huis, IV, to (or collection by) Plaintiff, Marine Ventures, Ltd., for alleged breaches of the Commercial Lease Contract with Marine Ventures, Ltd., and/or for Defendant, Edward Van Huis, IV's, alleged violation of the Texas Uniform Fraudulent Transfer Act and/or the Texas Business Organizations Code.

Van Huis attacks the trial court's injunction arguing that Marine Ventures did not carry its burden demonstrating the value of the land and presented the Court with an improper standard for an injunction amount as applicable under *Gilbert Wheeler*. *In Gilbert Wheeler,* the Texas Supreme Court stated that the following regarding temporary and permanent injury to real property.

> We hold that application of the temporary-versus-permanent distinction in cases involving injury to real property is not limited to causes of action that sound in tort rather than contract. Of course, contracting parties are free to specify in an agreement how damages will be calculated in the event of a breach, but when they do not, both courts and parties benefit from the application of general principles with respect to calculating damages for such injury. In this case, we find persuasive our prior holding that, with respect to right-of-way agreements like the one at issue here, "the measure of damages for breach of an easement that restricted a right to cut trees would be the same as the measure for negligently cutting trees." This stands to reason because the injury in question under either cause of action is the same. We see no reason to compensate a party differently because the wrongful conduct that caused the identical injury stems from breaching a contract rather than committing a tort. Further, the exceptions to the general rules in this area, discussed below, operate to ensure landowners are adequately compensated. Accordingly, we hold that the temporary-versus-permanent distinction underlies the determination of the proper measure of damages for both the trespass and breach-of-contract claims at issue.

25

…

> As noted above, the general rule in cases involving injury to real property is that the proper measure of damages is the cost to restore or replace, plus loss of use for temporary injury, and loss in fair market value for permanent injury. However, we apply this rule with some flexibility, considering the circumstances of each case to ensure that an award of damages neither over– nor under-compensates a landowner for damage to his property. We maintain that the purpose of the law "in every case, is to compensate the owner for the injury received, and the measure of damages which will accomplish this in a given case ought to be adopted." For that reason, Texas courts have appealed to a number of exceptions to the general rule when it would compensate a landowner unjustly. Two of those exceptions are at issue in this case.

*Id.* at 478–482 (citations omitted). The *Gilbert Wheeler* court limited its holding to cases involving breach of contract and tort. *See id.* Marine Ventures has pleaded causes of actions against Van Huis for breach of contract, but also for TUFTA violations, and environmental damages under Texas Health and Safety Code Section 361.344. Van Huis does not contest the sufficiency of the evidence to support the temporary injunction on any other cause of action other than breach of contract. As such,

> [i]f an independent ground fully supports the complained-of ruling or judgment, but the appellant assigns no error to that independent ground, we must accept the validity of that unchallenged independent ground, and thus any error in the grounds challenged on appeal is harmless because the unchallenged independent ground fully supports the complained-of ruling or judgment.

*Oliphant Fin. LLC v. Angiano*, 295 S.W.3d 422, 424 (Tex. App.—Dallas 2009, no pet.) (discussing unchallenged grounds in the context of dismissal). If an applicant

pleads and proves the essential elements to grant the temporary injunction for an independent cause of action, any trial court error pertaining to other independent causes of action is harmless given the pleaded and proven ground fully supports the temporary injunction. *Washington v. Associated Builders & Contrs. of S. Tex. Inc.*, 621 S.W.3d 305, 311–12 (Tex. App.—San Antonio 2021, no pet.). Therefore, because Van Huis does not challenge the Marine Ventures TUFTA or environmental claims, and the trial court did not specify which ground upon which it granted the temporary injunction, we must accept the validity of the unchallenged ground and any error of the challenged ground on appeal is harmless. *See Hartwell*, 528 S.W.3d at 763 (citing *Oliphant*, 295 S.W.3d at 424); *see also Ahtna Support & Training Servs., LLC v. Asset Protection & Security Servs., LP*, No. 13-19-00196-CV, 2020 WL 1856470, at *4 n.8 (Tex. App.—Corpus Christi–Edinburg April 9, 2020, no pet.) (mem. op.); *In re Estate of Minton*, No. 13-11-00062-CV, 2011 WL 2475394, at *4 (Tex. App.—Corpus Christi–Edinburg June 23, 2011, no pet.) (mem. op.). We overrule Van Huis's second issue.

## C. Issue Three

In his final issue, Van Huis challenges the trial court's decision to set the bond amount for the temporary injunction at $500. Van Huis argues that the $500 is not appropriate to freeze four million dollars in funds, the funds represent the bulk of his personal assets, and should be set in a "far greater amount."

27

"A trial court has considerable discretion in setting the amount of bond for a temporary injunction." *Biodynamics, Inc. v. Guest*, 817 S.W.2d 128, 131 (Tex. App.—Houston [14th Dist.] 1991, writ dism'd by agr.) (citation omitted). "The purpose of the bond is to protect the enjoined party from damages it may incur resulting from an improperly granted injunction." *Hartwell*, 528 S.W.3d at 770 (citations omitted). "The determination of the adequacy of the bond set by the trial court is to be made on a case-by-case basis based upon the record before the reviewing court." *IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 203 (Tex. App.—Fort Worth 2005, no pet.) (citations omitted). The amount of bond is soundly within the discretion of the trial court and we will not disturb the trial court's determination of a bond on appeal absent an abuse of discretion. *Id.*

While Van Huis testified that the injunction would basically tie up all his money and affect his ability to support his family in the manner they were accustomed, Van Huis offered the trial court no evidence at the hearing on the temporary injunction of any potential damages he may suffer should it be determined that these assets were wrongfully enjoined. *See id.* at 203 (explaining that evidence regarding harm of bond amount must be "ascertained with a reasonable degree of certainty and exactness[,]" and general testimony that the income about lost profits needed to support the appellant's family, was insufficient to prove lost profits); *see also Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279

28

(Tex.1994). Testimony cannot be too general or conclusory about lost profits or damages to show the trial court abused its discretion when setting a bond amount. *Hsin-Chi-Su v. Vantage Drilling Co.*, 474 S.W.3d 284, 304 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (holding the trial court did not abuse its discretion in setting a bond amount when the appellant did not "explain how he calculated this amount or the nature of such potential loss"). The record does not demonstrate that the trial court abused its discretion by setting a $500 dollar bond amount. We overrule Van Huis's last issue.

## IV. Conclusion

Having overruled all Van Huis's issues on appeal, we affirm the judgment of the trial court.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on September 9, 2021
Opinion Delivered March 31, 2022

Before Golemon, C.J., Kreger and Horton, JJ.

29